## LOUIS FARBER, Respondent, v. BOSTON INSURANCE CO., Appellant.[*]

In the Kansas City Court of Appeals, December 31, 1923.

1. **INSURANCE: Evidence on Issue as to Whether Insured Burned His Property Held Sufficient to go to Jury.** In a suit on a policy of fire insurance, where defense was that fire was of incendiary origin, evidence *held* sufficient, without building inference upon inference, for submission to jury of the issue as to whether insured burned his property. *

2. **EVIDENCE: Circumstantial Evidence: Rule in Civil Case with Respect to Circumstantial Evidence Stated.** In a civil case circumstantial evidence need not actually exclude every other reasonable hypothesis than the truth of the fact which it is adduced to prove; but it is enough that the jury can reasonably find such fact or facts from the circumstances, without piling inference upon inference.

3. ————: **Offer of Sum of Money in Payment of Loss Before Any Controversy or Disagreement Had Arisen Between Parties Held Competent as an Admission of Liability.** Evidence that adjuster of insurer offered, before any controversy or disagreement had arisen between the parties, to pay insured a certain amount is competent as an admission of liability in an action in which incendiarism is the defense, though as affecting the weight thereof defendant may show at the time of the offer it had no knowledge or suspicion of incendiarism.

────────

*Headnote 1. Fire Insurance, 26 C. J., Section 774; 2. Evidence, 23 C. J., Section 1792: 3. Evidence, 22 C. J., Section 347.

Appeal from Circuit Court of Buchanan County.—*Hon. Thos. B. Allen,* Judge.

AFFIRMED.

*Joseph Goldman* and *Strop & Silverman* for respondent.

*John S. Boyer* and *Crow & Newman* for appellant.

ARNOLD, J.—This is a suit on a policy of fire insurance in the sum of One Thousand Dollars issued by defendant on a stock of merchandise owned by plaintiff and located in a frame building at 1214 So. Sixth Street in St. Joseph, Missouri. The policy was issued for one year beginning at noon July 1, 1920. On February 11, 1921, at about three o'clock in the morning and while said policy was in force, part of said stock of merchandise was greatly damaged and much of it totally destroyed by fire. The petition prays judgment for $1000, and for statutory penalty for vexatious delay and attorney fees.

The amended answer alleges (1) several objections to proof of loss furnished by plaintiff, (2) that plaintiff refused to submit to arbitration under the provisions of the policy, (3) that defendant was liable only for its proportionate part of the damage or loss, and (4) that plaintiff "burned or caused to be burned the property described, causing the damage and destruction thereof." The reply was a general denial.

On the trial the court, by instructions, eliminated all the special defenses pleaded except the fourth, as enumerated above. At the close of the case plaintiff asked the following instruction which the court refused to give: "Y. The court instructs the jury that there is no evidence in this case upon which to base a verdict that plaintiff burned or caused to be burned the merchandise insured by the policy sued on herein."

The jury returned a verdict for defendant. Plaintiff's motion for a new trial was sustained, the court assigning as its reason therefor: ". . . because of giving defendant's instructions 2 and 3, and in refusing plaintiff's instruction "Y," and in excluding the testimony in reference to an offer made by one Harris to settle for the loss of fire." From this ruling of the court defendant appeals.

All other defenses pleaded having been eliminated at the trial, and no exception saved to such ruling of the trial court, the only question presented for our consideration is as to whether the action of the court in sustaining plaintiff's motion for a new trial was proper. The solution of this queston must be based upon the sufficiency of the evidence to warrant submission to the jury of the question as to whether or not plaintiff burned, or caused to be burned, the merchandise covered by the policy sued on.

Instructions numbered 2 and 3 for defendant, mentioned in the court's ruling, refer to the same question as contained in the refused instruction "Y" offered by plaintiff. A ruling on the latter will necessarily carry with it our decision as to the former.

In our consideration of the only question involved in this appeal, it will be necessary briefly to review the evidence bearing on the same. It may be well to note at this point that defendant relied upon circumstances to establish its defense.

The testimony tends to show that plaintiff had been accustomed to sleeping in his store and did so until a short time before the fire; that shortly before the fire he had rented other quarters for sleeping purposes. Plaintiff explained this change by saying he was expecting his family from Europe to join him shortly, and that the store was not a suitable place for them. It is also in evidence that plaintiff ate his lunch at a restaurant adjoining his store at 1:30 on the morning of the fire, which occurred, as stated above, at 3 o'clock a. m. It also is in

evidence that plaintiff was seen on the sidewalk in front of the restaurant at 12:06 a. m. of that day, and that he proceeded up the street in the direction of his home.

Another witness testified that plaintiff was seen about 1:00 a. m. on the morning of the fire in the railroad yards nearby, by one Murray, a watchman for an industrial plant, and that plaintiff had his collar turned up. (It was the month of February.) That plaintiff did not respond to his first challenge, but did to his second; and then stated he was searching for his lost dog. That plaintiff then proceeded in the direction of his home. The witness Murray further stated that in about thirty minutes after the conversation between him and plaintiff, he noticed the fire in the neighborhood of plaintiff's store and on passing the store the next morning he saw that it had burned. This testimony would tend to show plaintiff's presence in the vicinity of his store shortly before the fire. This testimony was denied by plaintiff.

There was also another circumstance which defendant insisted was at least suspicious and tended to show that plaintiff burned, or caused to be burned, his stock of merchandise. One J. W. Coale testified he had left a pair of shoes with plaintiff and shortly prior to the fire, he had visited plaintiff's store to get the shoes; that plaintiff told him to hunt for them, which he did, and that in the search he found some empty shoe boxes on the shelves and that he had joked plaintiff about the matter and plaintiff had answered that that was a way he had of enlarging his stock, saying "you can't get ahead of a Jew." This witness testified that he understood plaintiff's reply was a joke.

Testimony was presented by plaintiff in explanation of the empty shoe boxes which tended to show that while an inventory was being made after the fire, no unusual number of empty boxes was found.

This was practically the extent of the testimony upon which the case was sent to the jury upon the only

question in the case, and plaintiff's instruction "Y" refused.

A member of the fire department who attended the fire on call stated he was on the scene within two minutes after the alarm was received, and that there was nothing to indicate how the fire had started; that he knew nothing about its origin and saw nothing unusual in the situation there present.

Whether or not the facts and circumstances related by these witnesses are merely suspicious, depends largely upon the viewpoint of the party presenting or opposing them. This being a suit at law, the defendant is required, under the rules of evidence, to prove his case merely by a preponderance of the evidence. The distinction between the requirements in civil and criminal cases is ably and minutely discussed in State ex rel. v. Ellison, et al., 268 Mo. 239. In the case at bar the question is not as to whether or not a crime has been committed. The question is merely one of greater or less probability, and the jury in order to find for defendant needed to be satisfied of plaintiff's complicity in the burning of the merchandise, to the same degree and in the same manner as in any civil case. This is the rule declared by the Supreme Court in Rothschild v. Insurance Co., 62 Mo. 356, and it has been followed ever since by courts of appeal in this State.

The question for our determination than, is: Did defendant, in support of its plea that plaintiff burned his property, or caused it to be burned, make a showing that entitled it to go to the jury? It is said in Fritz v. Railroad, 243 Mo. 62, l. c. 77:

"In circumstantial evidence the principal and ultimate fact is got at by way of argument and by method of demonstration in the nature of *reductio ad absurdum.* [Will's Cir. Ev., p. 17.] Therefore, in cases turning on circumstantial (or what is called by civilians *oblique* and by the Scotch jurists *argumentative* evidence, the proof should have a tendency to exclude any other reasonable

Farber v. Boston Ins. Co.

conclusion than the principal fact. Says the author just quoted (p. 17), Hughes, J., in Mussolwhite v. Receivers, 4 Hughes (U. S. Cir. Ct. Rep. 1. c. 169) : 'The force and effect of circumstantial evidence depend upon its incompatibility with, and incapability of, explanation or solution upon any other supposition than that of the truth of the fact which it is adduced to prove.' ''

The facts presented by the record herein, when tested by the principles above enunciated, clearly indicate the defendant did not sufficiently show incendiarism in the destruction by fire of the property insured. In fact, as we view the evidence, there is no substantial showing that the origin of the fire was due to other than accidental causes. True, as stated above, there were some suspicious circumstances on the part of plaintiff, but he explained these, at least to his own satisfaction, and we think sufficiently to entitle him to the operation of the rule announced in the Fritz case.

We hold, therefore, the trial court was not in error in sustaining plaintiff's motion for a new trial on this ground.

One other point remains to be considered which we shall notice though it may not arise on the retrial of the case. During the progress of the trial the court refused to permit plaintiff to testify as to an amount offered him in settlement of his claims by the insurance adjuster, and in ruling on plaintiff's motion for a new trial, the court gave as one of the reasons for sustaining the motion, that the court was in error in its said ruling on the testimony in question. The objection to this testimony when offered was that if any offer of settlement was made, it was made in an attempt to compromise and therefore was not admissible as an admission against interest. A review of the testimony discloses that at the time the alleged offer was made, there was no disputed claim in existence. The testimony tends to show that the defendant company and other companies interested, through their adjuster, had informed themselves of the

amount of the loss under the policies. No proofs of loss had been made, no suit had been instituted, and no disagreement between the parties had arisen at that time. In fact, the testimony shows there was no dispute until the offer had been made and was rejected by plaintiff.

A similar question was discussed and decided against the contention of defendant in the case of Paris v. Waddell, 139 Mo. App. 288, 123 S. W. 79, where it is said: "It is claimed the court committed error in permitting the respondent to testify that when he went to see the appellant about the matter, he said he would pay five dollars for the use of the rig, but he would not pay any damages. Appellant's claim of error is made upon the theory that this was an offer of compromise. We do not so regard it. No suit was pending at the time and the respondent simply went to him to collect his bill for the use of the team and damages. The evidence fails to show any negotiations for a compromise were then under way." [See, also, Wood v. Duffy, 127 Mo. App, 543, 106 S. W. 82; Hilburn v. Insurance Co., 140 Mo. App. 355, 124 S. W. 63; Moore v. Gaus, etc., Co., 113 Mo. 98.] We therefore hold the evidence was competent and the trial court properly held that the refusal to admit it was error.

We find the ruling of the trial court in granting plaintiff a new trial was proper, for the reasons above stated. The judgment is affirmed.

*Trimble, P. J.,* in separate opinion, concurs in the result only, and *Bland, J.,* concurs with him in that view.

TRIMBLE, P. J. (concurring in result only).—I cannot subscribe to the view that the court should have taken from the jury the issue as to whether insured burned his property. To establish the rule really enunciated in Judge ARNOLD's opinion, would, it seems to me, enable an owner to safely burn his property without fear of losing his insurance provided he was careful enough to let no one see him burn it and arranged mat-

ters so that the fire would destroy all evidence of its origin. If the rule announced becomes the law, then in such cases, an insurance company cannot hereafter hope to successfully defend on the ground of the owner's incendiarism, unless it is able to produce evidence that the owner or his agent was actually seen to apply the firebrand.

It must be remembered in this case that the jury found for defendant, and, therefore, it cannot be correctly said, as the opinion does, that the suspicious circumstances were "explained" by plaintiff. All of defendant's evidence must be accepted as true, with all the inferences which can be reasonably drawn therefrom, together with such evidence furnished by plaintiff as tends to help defendant's theory. When all this has been done, then the question is: Has the jury, in this case, any substantial basis for their verdict?

The ultimate fact to be proved does not have to be established beyond a reasonable doubt, but is to be decided, as in other civil cases, according to the preponderance of the evidence and the reasonable probability of its truth. [Rothschild v. American, etc., Ins. Co., 62 Mo. 356.] It is true, Judge ARNOLD's opinion *in form* recognizes this, and yet, in reality it seems to me, the opinion proceeds to apply the criminal rule governing circumstantial evidence. The opinion is based upon two remarks in the case of Fritz v. St. Louis, etc., R. Co., 243 Mo. 62, l. c. 67, where it is stated that in circumstantial evidence "the proof should have a tendency to exclude any other reasonable conclusion than the principal fact" and that "The force and effect of circumstantial evidence depend upon its incompatibility with, and incapability of, explanation or solution upon any other supposition than that of the truth of the fact which it is adduced to prove."

It may be that, in civil cases, circumstantial evidence, in order to be sufficient, should have a *tendency* to exclude any other reasonable conclusion. Even so, I think

the evidence in the case at bar is sufficient to have that tendency. With reference to the second of the above quoted remarks, while the force and effect, that is, the *weight* of circumstantial evidence, does depend upon its incompatibility with and incapability of explanation upon any other solution than the truth of the fact it is adduced to prove, yet by that it was not meant to say that in order for circumstantial evidence to be *sufficient* in a civil case it must *actually exclude* every other reasonable hypothesis, for that is precisely what circumstantial evidence must do in a criminal case. Surely that was not what Judge LAMM meant. The Supreme Court, in State ex rel. v. Ellison, 268 Mo. 239, condemned an instruction, which told the jury that before they could find for defendant the circumstances proved must point to plaintiff and be inconsistent with any other reasonable hypothesis, and held that such an instruction incorrectly applied the criminal rule to a civil case.

As I view it, the decision in the Fritz case, goes no further than to hold that the circumstantial evidence in that case. *had no tendency to prove the ultimate fact sought to be established.* For the opinion goes on to set forth that there was *no evidence* that a cinder thrown from a passing engine could live, after being carried so far, in such a cold damp wind, and start a fire; that no engine had passed for three hours or more prior to the discovery of the fire, and even if a cinder could live under the above circumstances and start a fire, there is *no evidence* to show that it would smolder for the length of time it did and break forth without prior manifestation of its presence; that the fire when first seen existed on the *inside* of the mill and a coal oil stove, turned down low, had been left burning therein, and that night, shortly before the fire, a tramp had at a neighboring house applied for shelter and, upon being refused, had borrowed some matches and left, going in the direction of the mill. Under these circumstances the court held there was *no evidence* tending to show that a spark from de-

fendant's engine, passing several hours before the fire was discovered, set the mill on fire. This is what was really decided and not that circumstantial evidence must, in order to be sufficient in a civil case, exclude every other reasonable hypothesis. But, as I view it, the latter is the effect accorded the decision by Judge ARNOLD in applying it in support of his opinion. He holds, in effect, that while there are suspicious circumstances, yet as plaintiff explained these, and as there was no substantial evidence, in addition thereto, showing that the fire was of incendiary origin, therefore, there was no evidence from which the jury could find insured burned his property. This, it seems to me, is but another way of applying the criminal rule as to circumstantial evidence. But the case at bar is a civil case and if the circumstances are such that the jury can reasonably find therefrom that plaintiff burned his property, then it was not error to refuse an instruction taking that issue from the jury. Of course, the jury cannot build an inference upon an inference. But if the circumstances are of such *variety* and extent as to justify the direct inference that plaintiff burned his property then there is no building of inference upon inference. This is on the theory that it is necessary to draw two inferences, namely, (1) that the property was intentionally burned and (2) that the plaintiff did it. And this is the subconscious idea underlying Judge Arnold's opinion, to-wit, that when the incendiary burning, i. e. the *corpus delicti,* is shown, *then* the jury may infer from the circumstances that plaintiff did it. It should be observed here that plaintiff's *presence* at the premises at the time the fire originated is not shown by circumstantial, but by *direct,* evidence. Three persons testified positively to his presence there. The jury believed this direct testimony and, *if* the fire was of incendiary origin, the inevitable result of the *direct* testimony as to plaintiff's presence is to establish the fact that he was the incendiary. Hence it may be asked, is not the *only* inference necessary to be drawn

from the circumstantial evidence the inference that the fire was of incendiary origin? But, even upon the theory that the two inferences above mentioned are necessary to establish the ultimate fact sought to be proved, the foregoing observations show that the two inferences may be drawn from the *whole* evidence, and do not violate the rule against piling inference upon inference, provided *each* inference arises *directly* from the particular circumstances supporting it, and is not itself dependent in any manner upon the other inference. Whether such is or is not the situation, the following statement of the evidence will disclose:

The fire occurred between 1 and 3 o'clock in the morning of February 11, 1921. Between July 1, 1920, and the date of the fire, plaintiff obtained eleven policies of insurance on his merchandise and at least nine of these were in force at the time of the fire. The policies in force, in addition to the one sued on, aggregated the sum of $8000. Of these, two for $1000 each were obtained January 23, 1921, another for $1000 was obtained January 26, 1921, and two others for $2500 each were obtained February 4, 1921, just seven days before the fire.

This suit was instituted September 14, 1921, on the policy for $1000 issued July 1, 1920. Shortly after the institution of this suit, plaintiff's deposition was taken, and in it he testified that he had slept in his store until a short time before the fire; that, expecting his wife (who was in Russia) to join him in this country, he had rented rooms about three blocks from his store; that before she came, and about three or four weeks before the fire, he removed his sleeping quarters to said rooms; that he quit rooming at the store because "it was awfully damp and I got sick;" he then said he had rented the rooms and, as he had to pay the rent, he might as well move there; that while it was a little damp for a man to sleep at the store it was not so damp as to injure any of his goods.

In this deposition he testified positively and unequivocally that the night of the fire he left his store between 8:30 and 9 o'clock and went home to his rooms; that he may have been an hour late in getting to his room, as he used to go to the show every night after closing the store; but that when he reached home he went to bed and to sleep, staying in his room all night, and *distinctly remembered* that he was not near his store that night after nine o'clock and did not return to his store until 7 o'clock the next morning when he then learned of the fire and found that his store was destroyed; that he was sure that, within an hour after he left the store that evening, he was at home and slept there and remained there till the next morning.

At the trial, he testified that prices in his line of goods were ten to fifteen per cent lower than they were six months before the fire; that at the time of the fire he had $14,500 of insurance on the stock, $150 on the fixtures and $350 on a stitcher machine; that the market value of his stock was $18,974 and some cents, that the way he knew of its value was because he had taken an inventory of it on January 1, and could tell by his bank-book that he had only sold some six or seven hundred dollars of goods out of the stock up to the time of the fire. He could not tell the amount of goods he had bought in that time as his bills were burned in the fire. On cross-examination he could not take the inventory and tell what any particular item was, whether clothing or anything else. (His was a general store, except that he did not sell hardware.) He said a young girl, his employee, helped him make the inventory but she was not called as a witness.

He further testified at the trial that he first learned of the fire when he came to the store at 7 o'clock in the morning, and found his stock burned "all over." He also testified at the trial that he moved his sleeping quarters from the store to the room he had rented, between three and four weeks before *Christmas*. (In his

deposition he said he moved three or four weeks *before the fire.*) He testified, on cross-examination at the trial, that he left his store to go to his room the night of the fire between 8:30 and 9 o'clock p. m., and at first said he did not see anyone or talk to any person on the way home, nor did he see or talk to his landlady that night. Afterwards he said he thought he talked to a lot of people on the street but could not remember who they were, it might have been at the Union Depot or some other place he could not remember; that he thought he reached home about an hour or a little more after he closed his store, he could not remember, but he was sure he went home; that his dog was in the store the night of the fire, he found him there after the fire; that he closed his store between 8:30 and 9 o'clock the night of the fire, but did not get home for maybe an hour or a little more after that.

But when asked if he stayed in his room all night, he said he didn't remember, he knew he slept in the room, but whether he left his room that night or not, he couldn't remember; that he might have come back to turn off the light because he "generally used to" keep a light turned on until 11 o'clock and he may have done this that night and maybe not, that he couldn't remember. He was asked if he knew the man who kept the restaurant next to his store, and he said he did, but could not "hardly remember" whether he went into the restaurant that night or not; he could not remember whether he was in the restaurant about 1 o'clock the night of the fire or not; he did not remember whether or not, between 12 and 1 o'clock the night of the fire, he saw Mrs. Howard who worked in the restaurant. He admitted that he saw Murray, the watchman guarding the property in the nearby yards, and was stopped by him, and told Murray that he was looking for his dog, but said that occurrence did not take place on the night of the fire, but two nights before the fire; he remembered that Murray stopped him and talked to him, but insisted

it was two nights before the fire. He was again asked if
he did not come out of his store between 12 and 1 o'clock
the night of the fire and see Mrs. Howard standing there
waiting to take the street car home, but he didn't remem-
ber, he might have done it, but he didn't think so. He
admitted that in his deposition he had said he went
home and stayed there all night, and he thought now he
went home and did not come back but he may have done
so to turn off the light; that although the burning of his
store was a very important event in his life, he could
not remember where he was that night or what he did.
Prior to this he had stated that his memory of what
occurred the night of the fire was "about the same" at
the time of the trial as it was at the time his deposition
was taken, but now he said he remembered better than
he answered at the time of his deposition. He admitted
that he knew Coale and that the latter may have been in
his store about the repair of his shoes, but he could not
remember; but when asked if Coale did not ask him why
he had so many empty boxes on his shelves and if he
(plaintiff) did not reply that that was the way to fix in-
surance companies, he testified that he never said it and
"never knew anything about it."

The defendant introduced Parrish, the night clerk
of the hotel and restaurant (which was the hotel dining-
room) immediately adjoining the plaintiff's store and he
testified that plaintiff was in the restaurant twice the
night of the fire, once about 10:30 and again at 1:30;
that Mrs. Howard also worked in the restaurant but she
went off duty at 12 midnight, and that witness himself
waited on plaintiff at 1:30; that about 2:30 he discovered
there was a fire from the fact that there was smoke com-
ing in under the doors on the side of the hotel building;
that he called the fire department and he then busied
himself in rousing the guests.

Mrs. Howard testified that she was employed in the
restaurant or hotel dining-room, and at twelve o'clock
that night she left the dining-room and went out and was

standing on the sidewalk waiting for a street car (which would get there about 12:06 or 12:07), to go home; that while standing there, plaintiff came out of the doorway of his store and remarked to her as he passed going north, "I am going home and going to bed," and that she replied, "That is where I am going as soon as I can get there;" that this was about 12:05.

Patrick H. Murray testified that he had lived in St. Joseph for forty-three years, and was watchman for the Metropolitan Paving Company at their plant in the Burlington yards; that this was about a block and a half from plaintiff's store; that the night of the fire he was making his rounds when he heard a fellow walking in the yards and called out to him but the man made no response and witness then saw a man trying to go around him walking at a good fast gait, "traveling in a kind of crouch" and "had his ears humped up in the collar of his overcoat," and witness said, "Don't run away from me. This is a special night watchman." The man then turned around and said, "Don't you know me?", to which witness replied, "Yes, I know you now." It was plaintiff. The witness said this occurred about a half an hour before he saw the fire, but he did not go over to the fire as he could not leave his plant, but looked about to see if any sparks were falling there. On cross-examination, he said he thought it was about a quarter or ten minutes to one o'clock when he saw plaintiff; but that he had an old Ingersoll watch that didn't keep very good time and he tried to "regulate" it by the time the Omaha train No. 23 passed which "had just pulled out." Its time to pass was 12:58 but witness did not know whether it was on time that night or not; he testified positively that he saw the fire about thirty minutes after talking to plaintiff and upon going over there the next morning he saw it was plaintiff's store that had burned. He said plaintiff told him he was looking for his dog as someone had said it was over there or had seen it there. (Plaintiff, in his testimony at the trial, placed this occurrence

two nights before the fire and stated that afterwards he found his dog over across the tracks and took him back. He testified that he found his dog in the store the next morning after the fire though the same day of the fire he wrote the insurance company that his "entire stock" was "totally destroyed." It may be, however, that he meant he merely found the remains of his dog, but at any rate he said he was not looking for his dog the night of the fire, but two nights before that.)

It is true, Mr. Brennon of the fire department testified that the alarm was turned in to the department at 3 o'clock and that the fire brigade got there in about two minutes, and that he saw nothing to indicate how the fire originated and saw nothing unusual, yet he also testified that when he got there he didn't know how long the fire had been burning, and the firemen rescued the guests by putting up ladders, and that the store was wood or frame. He did not testify that he made any investigation at that time to ascertain the origin of the fire, and manifestly there was no time to do so.

There was also evidence that shortly after the fire, when two merchants were sent there to examine the remains of the stock that had been burned to see what might be left, plaintiff at first refused to let them in but finally allowed them to go in but would not permit them to open or touch anything and hence they could make no examination.

Plaintiff testified that these men were invited in, but that, owing to the mud and the condition the stock was in, the men did not attempt any examination.

On the back of the lot on which the store stood was a warehouse, and plaintiff had a controversy with his landlady as to whether this warehouse was included in the lease, plaintiff contending it was and that he needed it for storage purposes. Plaintiff admitted that he had some of his stock in there, that the only way to get to the alley from his store was through the warehouse; that he sold or delivered goods from this warehouse and that about two truck loads of property were taken out of

the warehouse just before the fire. Plaintiff testified, however, that this was property, boxes, etc., belonging to his landlady who would not clean out the warehouse and that as he was holding on to the warehouse he had her property hauled out himself.

Now the question is, are the foregoing facts sufficient to take the case to the jury on the issue raised by the defendant? As I view the matter, they are. It is true the jury cannot draw one inference from the facts and circumstances, and then from the *same* facts supporting that inference draw another inference which is in reality resting upon the other inference, for that would be piling one inference upon another. But the jury can, from the *direct* evidence that plaintiff was present at that unreasonable and unusual hour of the night, find that he was there; and then, from his suspicious actions while there, and his denial of being there or desire to conceal the fact that he was there, draw the inference that he caused the fire that burst forth shortly after. In other words, there is really but one inference which the jury drew, namely, that he burned his property; or, if there be two inferences, each is drawn from separate and independent facts. [Collins v. Star Paper Mill Co., 143 Mo. App. 333, 341.]

I, therefore, dissent as to the above discussed ground of Judge ARNOLD's opinion, but concur in the result reached, since there was error in excluding the evidence that the adjuster offered, in behalf of all the insurance companies interested, to pay a sum in excess of $8000. There was no evidence this was offered as a compromise. No controversy or disagreement had arisen between the parties. It was competent as an admission of liability. [January v. Harrison, 199 S. W. 935; Paris v. Waddell, 139 Mo. 288; Wood v. Duffy, 127 Mo. App. 543; Hilburn v. Phoenix Ins. Co., 14 Mo. App. 355, 363; Moore v. Gaus, etc., Co., 113 Mo. 98, 111-112; Mason v. Agricultural Ins. Co., 150 Mo. App. 17, 23; Lehman v. Hartford Fire Ins. Co., 183 Mo. App. 696, 705.] True, plaintiff did finally urge as a reason for its admittance that it was necessary

Farber v. Boston Ins. Co.

to prove this in order to lay a foundation for the appraisement, and defendant did obviate that objection by admitting that there was, at some time, a disagreement. But prior to this admission plaintiff had offered the testimony generally and without limitation as to purpose, and the court had excluded it, the plaintiff excepting. If the evidence was admissible for any purpose this would entitle plaintiff to its admission even though plaintiff, afterward, advanced a specific reason for its admission which defendant obviated by the admission above noted. At least this is true where, as in this case, the court sustained plaintiff's motion for new trial, giving the exclusion of said evidence as one of the reasons therefor.

Even if defendant did finally withdraw all contention as to the value of the property, nevertheless, it would still seem that an offer to pay, or, in other words, an admission of liability, on the part of a defendant who claims exemption from liability on the ground that insured burned his property, would have some bearing upon the question of the sincerity and validity of such claim. It may be urged that defendant may not then have known of any grounds for suspecting incendiarism. That would not affect the admissibility of the evidence, since plaintiff would not be required to show, as a condition precedent to introducing it, that defendant had no such knowledge. He would not be required to prove the state of defendant's knowledge, that would have to come from defendant itself. Defendant would have the right, of course, to weaken or destroy the effect of such admission by showing, if it could, that it was made at a time when defendant had no knowledge of incendiarism; but that would not render the evidence inadmissible in the first place. It would only effect its *weight*. However, there is no showing as to when defendant acquired its knowledge of suspicious circumstances.

For these reasons I concur in the result reached in Judge ARNOLD's opinion, but not in the manner in which that result is reached. *Judge Bland* concurs.