BREMEN BANK & TRUST CO., a corporation, Appellant-Respondent,

v.

Chester BOGDAN & Betty Bogdan, Defendants-Appellants, Associated Grocers' Company of St. Louis, a corporation, Defendant-Respondent, A. J. Frederick Meat Company, a corporation, Defendant.

Nos. 34334, 34368.

Missouri Court of Appeals, St. Louis District, Division Two.

July 31, 1973.

Jules Q. Strong, Tyree C. Derrick, St. Louis, for appellant-respondent.

Morton R. Newman, St. Louis, for defendants-appellants.

P. Terence Crebs, Michael A. Fisher, Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, for defendant-respondent.

KELLY, Judge.

This is a consolidated appeal from a judgment of the Circuit Court of the City of St. Louis against Chester Bogdan and Betty Bogdan, his wife, in favor of the Bremen Bank & Trust Co. (hereinafter referred to as the "Bank") in the sum of $15,609.26, plus interest and costs, and against the Bank and in favor of the Associated Grocers' Company of St. Louis (hereinafter referred to as "A.G.") wherein the Bank was the plaintiff in the trial court and the Bogdans and A.G. were co-defendants.

The points presented to this court for review with respect to the Bogdans' appeal are twofold: 1) whether the judgment of the trial court with respect to Mrs. Betty Bogdan was against the greater weight of the evidence, and 2) whether the trial court was guilty of committing prejudicial error in admitting into evidence (a) an offer of settlement and (b) evidence of the Bogdans' assets. The Bank presents one point: whether the trial court erred in en-

tering its judgment on a directed verdict for A.G. sustained at the close of the Bank's case.

■ With reference to the Bogdans' first point the Bank must be given the benefit of any and all reasonable inferences to be drawn from the evidence not in conflict with its theory of the case. James v. Turilli, 473 S.W.2d 757, 761[6] (Mo.App. 1971). Viewing the evidence in this light, the jury could have found that sometime in 1950 or 1951 Chester Bogdan purchased from his father a grocery store and meat market which the elder Bogdan had operated over the years at 3960 North Twentieth Street in the City of St. Louis, Missouri, as Bogdan's Market. Betty Bogdan, Chester's wife, kept the books for the business and on occasion helped out at the store.

From the date of the purchase of the meat market and grocery, Chester Bogdan maintained a checking account with the Bank and used this in the operation of the business. Prior to October 1, 1963, he was the only one authorized to sign checks on this account. Commencing with June 19, 1957, and until October 27, 1969, Mrs. Bogdan had her own individual checking account in the Bank. On October 1, 1963, the account which previously had been in Chester's name alone, was changed to an account for "Chester or Betty Bogdan" and a new signature card was executed by both Mr. & Mrs. Bogdan, authorizing Mrs. Bogdan as well as Mr. Bogdan to issue checks against that account. This signature card was in the following form:

"Bremen Bank and Trust Company
3529 North Broadway
St. Louis, 7, Missouri

"Gentlemen:

"We, the undersigned, hereby open a checking account with you in our joint names, it being understood either of us may sign checks against said account and that upon the death of either of us the balance, if any, in said account shall vest in the survivor, her or his heirs, executors, administrators or assignees.

"The above provisions apply to all moneys now or hereafter accepted by you for deposit in said account, including the proceeds from any check or draft payable to the order of either or both of us, irrespective of whether or not such check or draft shall bear the endorsement of either or both of us.

"Witness our hands this 1st day of Oct. 1963.

/s/ Chester Bogdan
/s/ Betty Bogdan."

On the back of the card, appears:

"Name of Corporation, Firm or Individual
Chester or Betty Bogdan

To the Bremen Bank and Trust Company, St. Louis, Mo.

Authorized Signature (give official title, if any)
/s/ Chester Bogdan Owner
/s/ Betty Bogdan
"Address 3960 N. 20th St.
Date 10/1/63"

At the same time the signature card aforesaid was executed, Mr. Bogdan also executed the following form:

"Individual Unincorporated Operating Under Trade Name
Authority to Open Deposit Account
Date 10/1/63

"To BREMEN BANK AND TRUST COMPANY

"The undersigned desires to establish with you a deposit and checking account to be known as BOGDAN'S MKT. and hereby certifies that said name is a trade name used in the conduct of an unincorporated business.

"Checks and orders for the payment of money withdrawing funds from said account may be signed by:

Chester Bogdan or

Betty Bogdan

"Checks, drafts, notes, bills of exchange and orders for the payment of money

may be endorsed by any of the above and deposited with you for the credit of said account. Such endorsements may be made in writing or by a stamp and without designation of the person so endorsing. "The undersigned authorizes and requests you to pay and charge to said account checks, obligations and orders for the payment of money drawn on or payable at, or which shall be paid or honored by your bank when so signed whether payable to the order of any of said signers or not; and further authorizes and requests you to receive deposits and conduct the said account with the instructions stated above, and stated on the authorized signature card filed with you by the undersigned.

"If any other persons become interested in said business as co-partners of the undersigned or if the business should become incorporated the undersigned will notify you promptly.

/s/ Chester Bogdan."

Over a period of years the Bank made 21 loans to both the Bogdans which were evidenced by ninety day notes bearing the signatures of both Mr. & Mrs. Bogdan. Most of the money from these loans were used in the business of Bogdan's Market.

After acquiring the store Mr. Bogdan became a "member" of the A.G. and as an incident of this membership he was entitled to make purchases of meat and other grocery items from local packing houses and distributors of such grocery items through A.G., charge the purchases to the A.G. account and then, in turn, be billed by A.G. for these purchases at regular intervals with a service charge of one-half of one per-cent added on for this service. (A.G. also received a discount of the same amount, i. e., one-half of one per-cent, from the packing houses and grocery distributors, making the total revenue one per-cent.)

A. J. Frederick Meat Company (hereinafter referred to as "Frederick's"),[1] a supplier of the Bogdan Market and operated by Mr. Alfred J. Frederick, a close personal friend of Mr. Bogdan, was, in 1969, and for some time prior thereto, experiencing financial difficulties and having no success in obtaining extension of credit. Sometime in 1967 the plight of Frederick's became so precarious that Mr. Alfred J. Frederick and Mr. Bogdan made arrangements for Frederick's to use Mr. Bogdan's account with A.G. so that Frederick's could continue making purchases from local packing houses. The Bank's evidence established a number of transactions between October, 1968, and August, 1969, whereby Frederick's made purchases from local packing houses, took delivery, and then sold the meat to a number of retailers, including Bogdan's Market. The invoices from the packing houses were forwarded to A.G. and then billed to Bogdan, who would advise Frederick's the amount of its purchases included in the A.G. statement. Frederick's would then pay Bogdan, usually by check.

In August, 1969, a check from Frederick's made payable to Chester Bogdan in the sum of $12,234.03 was deposited in the Bank by Mr. Bogdan in the joint account of the Bogdans and was returned to the Bank by the Union State Bank of St. Charles, Missouri, unpaid. This deposit had been credited to the Bogdans' account by the Bank. Subsequently two other checks, each for $5,283.00, or a total of $10,566.00, drawn on the account of Frederick's at the Union State Bank, St. Charles, Missouri, and payable to Chester Bogdan were deposited in the Bogdans' account in the Bank and after presentment were returned "unpaid." An overdraft in the Bogdans' joint account in the sum of $15,609.26 occurred as a result of these transactions plus two service charges for handling the checks.

1. While Frederick's was joined originally as a defendant, the Bank dismissed as to this defendant prior to submission of the case to the jury.

A letter was sent by the Bank to Mr. Bogdan advising him of the return of the Frederick's checks and requesting him to come to the bank offices "to discuss this matter." A meeting was held at the Bank on the 27th day of August, 1969, which was attended by John E. Maunder, the Bank's Vice-President, other Bank officials and both Mr. and Mrs. Bogdan. At this meeting Mr. Bogdan acknowledged the indebtedness and threw on the conference table some papers and remarked "Here is everything we own." Later, on September 5, 1969, a second conference was held but Mrs. Bogdan was not in attendance, and again discussions were held relative to what Mr. Bogdan was doing to correct the overdraft in the account. The Bank suggested that the Bogdans give notes and deeds of trust on the various properties owned by them. Then, on October 22, 1969, a third meeting was held attended by both of the Bogdans, and representatives of the Bank, and at this meeting it was proposed by the Bank that a loan be made by the Bank to the Bogdans to cover the amount of the overdraft, said note to be secured by a first deed of trust on the home and store owned by the Bogdans. This the Bogdans refused to do.

Neither Frederick's nor the Bogdans paid the overdraft in the Bogdans' joint account and this suit followed.

Mrs. Bogdan's first point is that the Bank failed to make a submissible case against her because the evidence clearly demonstrates that she had no actual ownership interest in the business and she was merely a signatory on the business account as a matter of convenience; that she could not, therefore, be personally liable on the overdraft of the business checking account.

 This allegation of trial error has not been preserved for review in this court. An examination of the motion for new trial filed in the trial court reveals that it does not contain this point. This violated Rule 79.03, V.A.M.R., and preserves nothing for review in this court.

Rule 84.13(a). The only assignments of error presented to the trial court which might, by the most liberal construction, approach this point are: "5. Because the verdict is against the evidence. 6. Because the verdict is against the weight of the credible evidence in the case. 7. Because the verdict is against the law under the evidence." These assignments preserve nothing for the appellate court to consider; they are for the trial court alone. Robbins v. Robbins, 328 S.W.2d 552, 555–556 [5, 6] (Mo.1959). Nevertheless, there was ample evidence to support the finding by the jury that Mrs. Bogdan as a joint tenant was liable on the overdraft. § 362.470 RSMo 1969, V.A.M.S.; 5B Michie on Banks and Banking, § 302, P. 170 (1950); Popp v. Exchange Bank, 189 Cal. 296, 298 P. 50 (1922). We therefore rule this point against Mrs. Bogdan.

The next assignment of error is concerned with admission into evidence what Mrs. Bogdan identifies as evidence of an offer of compromise or settlement. We do not comprehend the discussions characterized as constituting an offer of compromise or settlement. The original meeting of August 27, 1969, was a meeting requested by the Bank officials to discuss with the Bogdans what they, the Bogdans, intended to do about the overdraft. Mr. Maunder, Vice-President and Assistant Secretary of the Bank, testified that at this meeting the amount of the overdraft was discussed with the Bogdans; that they acted "knowledgeable" that there was an overdraft; and that they stated that they would pay it as soon as they could. The manner in which they would make payment was discussed; they said they would pay the Bank as soon as Frederick's paid them. It was during this meeting that "They laid a number of papers on the table and said 'here is everything we own.'" This certainly did not amount to an offer of settlement; it was, as the judge correctly ruled, an acknowledgement of their debt to the Bank for the overdraft. Nor were the contents of these "papers" more fully developed.

Relative to this same meeting of August 27, 1969, Mr. Goedeke, Chairman of the Board of the Bank, was permitted to testify over objection, concerning the placing of the papers on the table and the statement "this is all we have." He further testified that the result of this meeting was that the Bogdans said they would try to work it out, that all they had was their home, some real estate in which they had an interest, a four-family flat on 21st Street, a four-family flat on Obear Avenue and the store.

In admitting this evidence the court made it abundantly clear that he was admitting it only as evidence that the Bogdans were acknowledging the debt.

Over objection, Mr. Maunder was permitted to testify that at a subsequent meeting on September 5, 1969, the Bogdans made no offer to pay the overdraft; that the Bank had suggested they give notes secured by deeds of trust on the properties at "2960 North 20th Street and a 4-family flat, 4016 or 4008 North 21st and their residence at 1121 Veronica and a 4-family flat, 2016 Obear." He was then asked whether he remembered a conversation about some certificates or any stock, securities or notes due in five years. He replied yes, but when counsel attempted to develop that line of inquiry, objection by counsel for the Bogdans was sustained and this tack of interrogation was abandoned, the judge limiting a showing to the acknowledgement of the Bogdans that they owed the debt.

Further evidence was offered that at a third meeting, that of October 22nd, 1969, the Bank proposed that it make them a loan to cover the overdraft to be secured by a first deed of trust on the Bogdan home and on the store. Mrs. Bogdan refused to adopt this suggestion.

There was no indication at any time that the Bank was seeking to compromise its debtors' overdraft. These meetings were merely for the purpose of working out by negotiation a method for satisfying the debt. At no time was there a denial that the Bogdans owed the amount claimed; the only matter to be negotiated was how they would pay it. In Ferguson v. Davidson, 147 Mo. 664, 49 S.W. 859, 860 (1899) it was held that an offer to transfer a mortgage in payment of a debt is not an offer to compromise and is not inadmissible as such. The offer was made as a method of payment of an acknowledged obligation. Also, in Lehmann v. Hartford Fire Ins. Co., 183 Mo.App. 696, 167 S.W. 1047, 1048–1049[1] (1914), evidence of a statement by a claims adjuster that all the insurer could do was give him fifty cents on the dollar was held admissible against the insurer over its contention that it was an offer to compromise. The court said "There, as here, like evidence was held to be admissible, the statement having been made, not in an effort to compromise, but in an interview between the parties looking to the adjustment of the loss and preparatory to making the necessary proofs, * * *" 167 S.W. 1049. Distinction is made between statements made prior and subsequent to the filing of the suit; those taking place after the commencement of the litigation being inadmissible if made in an effort to compromise the pending lawsuit. Farber v. Boston Ins. Co., 215 Mo. App. 564, 256 S.W. 1079, 1083[3] (1923) held that evidence of an offer by an adjuster of an insurer, before any controversy or disagreement between the parties, to pay a certain sum, was admissible as an admission of liability. In McKeown v. John Nooter Boiler Works Co., 237 S.W.2d 217, 223[3] (Mo.App.1951) the plaintiff sought to recover a commission on an alleged oral purchase contract between the plaintiff and the defendant company; a statement of an officer of the defendant company that the plaintiff "was entitled to something for his work * * *" was held admissible as an admission of "an independent fact" and did not constitute an offer to compromise. "Defendant's offers were simply an attempt on its part to pay less for the benefits it received from plaintiff's information and services than plaintiff demanded as compensation therefor

under what plaintiff claimed was defendant's specific oral agreement. *Such offers were admissible because they were coupled with admissions against interest * * * "* 237 S.W.2d 224. (Emphasis supplied).

■ We hold that these statements were admissible as acknowledgements of the debt of the Bogdans and therefore rule this point against Mrs. Bogdan.

■ As the second prong of this attack on the admissibility of the evidence of conversations had during the meetings at the Bank between the Bogdans and the officers of the Bank, Mrs. Bogdan complains that the admission of evidence of their assets was highly prejudicial and contributed to the jury's verdict and resulted in bias and prejudice. The general rule is that it is improper to admit testimony relative to the financial status of the parties to a lawsuit except when relevant to the issues joined. 31A C.J.S. Evidence § 177, p. 453. Admission of such evidence which would tend to create bias or prejudice should be guarded against by the trial court and not permitted to come into the case. Critcher v. Rudy Fick, Inc., 315 S.W.2d 421, 427[2] (Mo.1958).

■ At no time was any valuation placed upon the properties mentioned in evidence nor was the evidence offered for the purpose of establishing financial worth. This evidence came in as part of the evidence to establish that the Bogdans acknowledged the debt and was properly before the jury for such purpose. We therefore also rule this point against Mrs. Bogdan.

We next move to consider the assignment of error that the trial court erred in directing a verdict in behalf of A.G. and entering its judgment accordingly. The Bank's theory with respect to A.G. was "joint venture." It was the Bank's theory that the arrangement whereby Frederick's was allowed to make purchases on the Bogdan account with A.G. constituted a joint venture and A.G. was therefore liable for the overdraft along with its co-venturers. We conclude the court's action was proper.

A joint venture has been defined as an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge. Jeff-Cole Quarries, Inc. v. Bell and Hilton, 454 S.W.2d 5, 14[9] (Mo. 1970). A joint venture is a creature of contract, but this relationship is not dependent upon a specific written agreement, but may be implied or proven by facts and circumstances. Gales v. Weldon, 282 S.W.2d 522, 527[3] (Mo. banc 1955); Hobart-Lee Tie Co. v. Grodsky, 329 Mo. 706, 46 S.W.2d 859, 861 (1931). The criterion for determining whether a joint venture exists is the intention of the joint venturers.

"As between the parties themselves, the relationship of joint venturers is a matter of intent, and arises only where they intend to associate themselves as such . . . "As to third persons, it is clearly the rule that the legal and not the actual intent of the parties controls, and the parties may be estopped in favor of third persons from denying that they are joint venturers, even though they never intended to become such. If the intent to do those things which constitute a joint venture exists, the parties will be joint venturers even though they also intended to avoid the personal liability that attaches to joint venturers." 46 Am. Jur.2d, 30–31, Joint Venture, § 9.

Here no express agreement was pleaded nor was it proven. If the Bank made a submissible case against A.G. it would have been on the theory of an implied contract or agreement. In examining the evidence to determine whether a case was made we must view all of the evidence in the light most favorable to the Bank's theory of the case and indulge in every inference which men of average intelligence and fairness

might draw from the proven facts, James v. Turilli, supra, and then reach a decision whether there are sufficient facts from which a jury could infer that the arrangement between Frederick's Bogdan's Market and A.G. constituted a joint venture.

█ The Bank places the thrust of its argument on the basis that A.G. advanced credit to the operation, realized a profit, and therefore was constituted a joint venturer. Assuming arguendo that A.G. did realize a profit we fail to find any evidence, direct or circumstantial, that A.G. intended to be a joint-venturer with Frederick's or Bogdan's Market. Nor was there any evidence that a profit, if there was one, was shared between the three; nor that losses were borne by the three parties to the alleged joint venture. The Bank produced no evidence whatsoever of a mutual right to control the activities of the alleged joint-venturers. This arrangement was at best an accommodation to Frederick's by a single member of a corporation consisting of many members, all of whom held certificates in A.G. Nor did the Bank produce any evidence that it relied on the fact of joint venture when it credited Frederick's check as a deposit to the joint account of the Bogdans and therefore there would be no basis for any theory of estoppel. To hold that the mere extension of credit to a party together with a realization of a profit therefrom constitutes one a joint venturer would ignore those other elements of intent, sharing of profits and losses, mutual right of control, and community of interest inherent in the legal relationship. Bell v. Green, 423 S. W.2d 724, 731[8] (Mo. banc 1968).

We find no error in the action of the trial court in sustaining A.G.'s motion for a directed verdict at the close of the Bank's case and having disposed of each assignment of error, affirm the judgment of the trial court.

SMITH, P. J., and SIMEONE, J., concur.