Floyd E. Jacobs, Administrator of the Estate of A. Hattrem et al., v. A. Danciger et al., Appellants.—130 S. W. (2d) 588.

Division Two, July 7, 1939.*

*NOTE: Opinion filed at September Term, 1938, April 20, 1938; motion for rehearing and transfer to Court en Banc filed; motion overruled at May Term, 1939, July 7, 1939.

*Ringolsky, Boatright & Jacobs* for appellants.

*Johnson, Garnett & Quinn* for respondents.

1044

COOLEY, C.—Action by vendors against vendees for damages for breach of contract. Verdict and judgment for plaintiffs for $9624, from which defendants appealed.

On April 23, 1920, A. Danciger, representing defendants, partners, of Kansas City, Missouri, entered into a written contract with A. Hattrem, representing plaintiffs, partners, of Salem, Oregon, whereby it was agreed that plaintiffs would sell and defendants would buy 150 bales of hops, to be delivered f. o. b. cars at Kansas City, Missouri, 50 bales in October, 50 bales in November and 50 bales in December, 1920. Thereafter the market price of hops declined. On September 23rd and 24th, 1920, defendants notified plaintiffs they would not accept the hops if shipped and would not comply with the contract. The hops, therefore, were not shipped. Plaintiffs sued to recover the difference between the contract price and the market value of the hops at the time of breach of the contract. Defendants, by their answer, alleged that the contract was void because in violation of law, in that plaintiffs knew defendants intended to use and sell the hops in certain packages called "home brew packages," containing materials and appliances for making home brew beer having more than one-half of one per cent of alcohol, contrary to Section 18, Title 2, National Prohibition Act, U. S. C., Title 27, Section 30 (27 U. S. C. A., sec. 30), and with such knowledge agreed and consented to such intended illegal use of the hops by defendants and aided and abetted them in their purpose to violate the law.

The case has been in this court twice before. At the first trial plaintiffs recovered judgment, which on appeal was revered by this court (Div. One), in Jacobs et al. v. Danciger et al., 328 Mo. 458, 41 S. W. (2d) 389. Another trial followed, in which the verdict was for defendants. On plaintiffs' appeal we again reversed the judgment and remanded the cause. [Jacobs et al. v. Danciger et al. (Div. Two), 339 Mo. 91, 95 S. W. (2d) 1193.] Both reversals were because of errors in instructions. Such further statement of facts as may be deemed necessary will be made in the course of this opinion. In this connection, also, we refer the reader to our opinions on the former appeals for more detailed statement of the facts.

I. Defendants contend that Instruction No. 5, given for plaintiffs was prejudicially erroneous. It reads:

"The jury are instructed that mere knowledge alone, without assent thereto or participation therein on the part of the sellers at the time of entering into a contract for the sale of a commodity that their purchasers intended to use such commodity as an ingredient in

a mixture, the sale of which would be a violation of law, would not in itself invalidate such contract; there must be some act or agreement or consent of the sellers in furtherance of such unlawful purpose.

"If you find and believe from the evidence that, at the time of entering into the contract in suit, the plaintiffs knew that the defendants intended to use said hops in the manufacture and sale of packages in violation of law, but notwithstanding such knowledge, if any, did nothing or agreed to do nothing which would be in furtherance of such purpose, nor consent to such violation, you will disregard the defense that the contract in evidence was a contract in violation of the law."

The complaints of said instructions are, first, that it directed the jury to disregard the defense of illegality of the contract unless plaintiffs were *particeps criminis* in a violation of law by defendants, and second, that it improperly singled out and commented upon certain evidence in its reference to plaintiffs' knowledge of defendants' intended illegal use of the hops.

Said instruction was given in both the previous trials to which we have referred. It was challenged by defendants on the first appeal and apparently met the approval of this court. Defendants now say, however, that they did not then raise the specific objections above indicated and that therefore the court did not pass upon those phases of the instruction, and further that, even if we were being asked to re-examine a contention previously made and ruled upon we have the power—and the duty—to correct our own errors if convinced that we erred on the first appeal; citing Mangold v. Bacon, 237 Mo. 496, 141 S. W. 650, and other cases. In that case the court (237 Mo. l. c. 512) stated the general rule to be "that legal conclusions announced on a first appeal, whether on the general law or the law as applied to the concrete facts, not only prescribe the duty and limit the power of the trial court to strict obedience and conformity thereto, but they become and remain the law of the case in all after steps below or above on subsequent appeal." The court stated the reasons for the rule, but noted also that there are well recognized exceptions thereto, citing illustrative cases, and summed up the discussion thus: "The premises considered, the sum of the matter is this: Whether from grace or right when cogent and convincing reasons appear, such as lack of harmony with other decisions and where no injustice or hardship would flow from a change, or where by inadvertence principles of law have been incorrectly declared the first time, or mistake of fact has been made, or injustice to the rights of parties would be done by adhering to the first opinion, then the exceptions to the rule have play, and it is our duty to re-examine and correct our own errors on the second appeal in the same case."

On the first appeal defendants in their brief (see 328 Mo. p. 460.) argued that "Knowledge by the seller that the purchaser is buying. for the purpose of having the hops used for making intoxicating liquor necessarily imputes to the seller an intent on his part that. they shall be so used. Such knowledge on the part of seller would make the seller guilty of the substantive offense. Therefore it was error to instruct that mere knowledge would not be sufficient to make the contract illegal." Whether "cogent and convincing reasons appear" for re-examining defendants' contention, assuming it to have been ruled against them on the first appeal, may well be doubted. But we deem it unnecessary to determine that question or to rule the point on that ground. We do not consider the instruction justly subject to the criticisms now leveled against it. On the first appeal defendants contended that the sale, with mere knowledge on the part of plaintiffs of the intended use by defendants of the hops, was a violation of Section 18, Title 2, National Prohibition Act, supra; also that under said statute "Knowledge alone is evidence from which the jury may find that plaintiffs intended the hops for use in manufacturing intoxicating liquor." [328 Mo. l. c. 468, 41 S. W. (2d) l. c. 391.] Said Section 18 reads:

"It shall be unlawful to advertise, manufacture, sell or possess for sale any utensil, contrivance, machine, preparation, compound, tablet, substance, formula, direction, or recipe advertised, designed or intended for use in the unlawful manufacture of intoxicating liquor."

Referring to that statute the court said (l. c. supra):

"It is not expressly provided in the statute that mere knowledge by the seller of the intended use of the substance by the purchaser is a violation of law. It seems if the Congress had so intended, it would have provided that it shall be unlawful to *knowingly* sell any substance intended by the purchaser for such use. It did not do so, but fixed the intention of the seller in making the sale as the test of legality. For this reason we think the word 'intended' was not used in the sense of mere knowledge. It means more than mere knowledge. It means knowledge of the seller accompanied by some act on his part indicating consent to or encouragement in such use. We are encouraged in this view by the general rule, which follows:" (quoting from 23 R. C. L., sec. 134, pp. 1317-19, and citing also 13 C. J., p. 517, and Michael v. Bacon, 49 Mo. 474, 476, quoting from the latter case).

Both contentions were denied, as was the further contention that mere knowledge of the intended use by defendants of the hops was evidence tending to show that plaintiffs were guilty of a conspiracy to violate the National Prohibition Act.

On the second appeal we reaffirmed those holdings as to the effect of mere knowledge on the part of the seller of the buyer's intended

illegal use of the hops. It is true, as defendants contend, that on the second appeal we said that under the Federal statute it was not necessary that the seller become a *particeps criminis* to the unlawful act of the buyer in order that the sale be unlawful. But we do not agree with defendants' further contention that the instruction in question directed the jury to disregard the defense of illegality unless plaintiffs had been *particeps criminis* to a violation of law by defendants. The language of the instruction is in the disjunctive. "There must be some act *or* agreement *or* consent" etc., and if the plaintiffs, though having *knowledge* of defendants' intended use of the hops "did nothing or agreed to do nothing . . . *nor consent to such violation*" the defense of illegality of the contract should be disregarded. We said on both the former appeals that the word "intended" as used in the statute means more than mere knowledge. "It means knowledge of the seller, accompanied by some act on his part indicating consent to, or encouragement in, such use." There was evidence on defendants' behalf from which the jury could find some act or agreement on plaintiffs' part indicating consent; also evidence from plaintiffs' side from which could be found absence of such act or agreement and absence of consent. So it was not improper to include all those elements in the instruction. But, as worded, the instruction did not direct the jury to disregard the defense of illegality unless they found that plaintiffs *neither* did anything nor agreed to do anything which would be in furtherance of the unlawful purpose, *nor* consented to such violation. Under that instruction the jury, if they followed it, as they are presumed to have done, could have found against plaintiffs on the ground of illegality of the contract if they found only that plaintiffs consented and nothing more.

Neither do we consider said instruction a comment on, or a singling out and undue emphasis of, the fact of knowledge, as those terms are and should be understood in cases in which comment on the evidence in instructions has been condemned. The court was merely telling the jury the legal effect of knowledge on the part of plaintiffs of defendants' intended use of the hops. In Tyler v. Hall, 106 Mo. 313, 17 S. W. 319, there was a vital question whether or not a certain deed made by Sylvester Hall purporting to convey land to his son George had been delivered to George. The trial court instructed the jury that although "Sylvester Hall during his lifetime kept the deed in a place to which George L. Hall had access, yet that fact, of itself, was not sufficient to constitute delivery. The intention to deliver must be proven by some word or act of the grantor." This court said, 106 Mo. l. c. 323, 17 S. W. 319:

"It is insisted that this instruction was a comment on the evidence, and was, therefore, improper. It is always proper for the court to declare to the jury the legal effect of the facts in proof. The very

purpose of instructions is to advise the jury as to the legal effect of the evidence. The fact that the deed was left by the grantor in a place accessible to defendant did not, as has been seen, constitute a delivery, in the absence of an intention on the part of the grantor to deliver and of the grantee to accept it. To simply declare this legal effect was not a comment on the evidence.''

In Ward v. Fessler (Mo.), 252 S. W. 667, 671, we said: "It is always proper for the court to tell the jury what is the legal effect of facts in proof. (Citing cases.) It is not proper for the court, in an instruction, to give undue prominence to certain parts of the evidence upon which the jury must pass in finding the facts. That is a comment upon the evidence, but that is very different from telling the jury what is the legal effect of certain facts in proof.''

Tyler v. Hall, supra, has been frequently cited and followed. In the recent case of Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648, this court cited with approval Ward v. Fessler, supra, and distinguished Barr v. City of Kansas, 105 Mo. 550, 16 S. W. 483, cited by appellants here. For other illustrative cases applying the principle announced in Tyler v. Hall, see the following: Gray v. Doe Run Lead Co., 331 Mo. 481, 53 S. W. (2d) 877, 883 (14); Offutt v. Battagala (Mo. App.), 44 S. W. (2d) 202, 204 (4-5); Acker v. Koopman (Mo.), 50 S. W. (2d) 100; Schrowang v. Von Hoffman Press (Mo. App.), 75 S. W. (2d) 649.

In the instant case the jury, without direction from the court, might have misunderstood the legal effect of mere knowledge alone on the part of plaintiffs of defendants' intended use of the hops, and might have given such mere knowledge an effect which should not be attributed to it. As we have pointed out, defendants' counsel themselves, on the first appeal, misconstrued the legal effect of such mere knowledge and urged for it an effect which this court said it does not have. If learned counsel could thus misconstrue plaintiffs' "mere knowledge," it is not unlikely that a jury of laymen, without direction from the court, might have had a similar misapprehension. The instruction served a useful purpose in clarifying the issues for the jury.

Appellants also challenge plaintiffs' Instruction No. 1, because, they say, it too required a finding that plaintiffs were *particeps criminis* in order to make the defense of illegality available. The instruction is long and we shall not quote it. It hypothesizes the facts necessary to be found to authorize a verdict for plaintiffs and directs such verdict upon the finding of such facts, unless it is further found that at the time of the sale Hattrem knew of defendants' intended use of the hops "and agreed to sell said hops in furtherance of such purpose, *as defined in other instructions.*" (Italics ours.) It does not attempt or purport to define what would constitute agreeing to sell in furtherance of such purpose, but points to "other instructions,"—

not one but all of them—for such definition. Read together, as they should be, the instructions clearly enough and we think sufficiently submitted to the jury the facts necessary to be found in order to justify a verdict for plaintiffs.

II. Appellants assign error in the admission of certain telegrams, or portions thereof, as indicated *infra*.

On September 23, 1920, defendants wired plaintiffs,

"We are discontinuing our malt business and will be unable to use the order for hops *wire us what you will take to relieve us of same*."

September 24, 1920, plaintiffs wired defendants,

"Answering your telegram twenty third we prefer ship according contract *however subject your immediate telegraphic acceptance will cancel contract in consideration of your paying us at this time in cash nine thousand six hundred and twenty four dollars which is the difference between market value and contract price*."

September 24, 1920, defendants wired plaintiffs,

"Your telegram twenty fourth received *we re-affirm statement of our telegram of yesterday* and will not receive any of your hops and *will not pay any damages demanded by you* as far as we are concerned the contract is terminated."

September 24, 1920, plaintiffs wired defendants,

"Answering your telegram this date beg to state that we will not cancel your hop contract with us as dated April twenty third nineteen twenty *only in consideration of your paying us at this time in cash nine thousand six hundred and twenty four dollars and this offer is made subject for your immediate telepraphic acceptance otherwise* will hold you liable for fulfilment of contract on your part in all of its terms."

The italics in the above quoted telegrams are ours, used to point out the portions objected to. Defendants objected to the introduction of the italicized portions on the ground that on the face of the telegrams it appeared that such italicized portions were statements made in an attempt to compromise and were therefore inadmissible. Negotiations for the peaceful settlement of disputes are to be encouraged and, if they fail, testimony with reference thereto should be excluded on a trial of the cause. [Starnes v. St. Joseph Railway, Light, Heat & Power Co., 331 Mo. 44, 52 S. W. (2d) 852, 855.] But it is not always easy to determine what constitutes an offer of compromise or negotiations looking to that end. In 3 Jones' Commentaries on Evidence (2 Ed.), section 1052, page 1939, we read:

"It is often difficult to determine, in a particular case, what amounts to an ordinary admission, and what constitutes an offer of compromise within the meaning of the general rule above stated; and the intention of the parties must be the guide in each case. If the intention

is apparent to concede liability and to seek to buy relief from a liability recognized as such, it is an ordinary admission against interest and not an attempt to compromise; but if, on the other hand, the proposal is tentative, made to 'buy peace,' and with the idea of mutual concessions, as to such point it is a mere offer of compromise. The test of what constitutes an offer of compromise within the rule is said to be whether the admission of the truth of the facts on which the claim is based is hypothetical only, in which case it cannot be regarded as any recognition of the basis of the opposing party's claim, or unconditional and made without regard to accompanying circumstances.

"Needless to say, statements and admissions made before any dispute took place, or after an attempted compromise has been abandoned, and admissions which, by their very nature, negative compromise, such as an endeavor to obtain time or arrange terms of payment, are not to be excluded upon the ground which prevents a bona fide offer of compromise from being used to the prejudice of either party."

In Moore v. Gaus & Sons Mfg. Co., 113 Mo. 98, 20 S. W. 975, the plaintiff was demanding of the defendant $2900 for certain work done. The defendant claimed he was entitled to $600 on account of increased insurance charges suffered by the plaintiff's delay in completing the work. The plaintiff drew a draft on the defendant for $2900, the contract price, and sent it to his agent to collect. The agent called on one of the defendant's officers and was told by said officer that he had left his proposition with his bookkeeper. The memorandum—"proposition"—read:

"Twenty-seven hundred dollars ($2,700) to be paid in three notes, $900 each, in sixty, ninety and one hundred and twenty days, without interest, or there will not be an acceptance of the work."

Said memorandum was read in evidence and it was contended on appeal that it should have been excluded as an offer of compromise. This court said, 113 Mo. l. c. 111, 20 S. W. 975:

"The rule excluding offers of compromise is stated by Greenleaf, sec. 192, 'that confidential overtures of pacification and any other offers or propositions between litigating parties, expressly stated to be made without prejudice, are excluded on grounds of public policy.' 'But in order to exclude distinct admissions of facts it must appear either that they were expressly made without prejudice, or, at least, that they were made under the faith of a pending treaty and into which the party might have been led by the confidence of a compromise taking place.' "

The court further said that the rule had always been recognized and enforced in this State but was not applicable to the facts of that case; that there was "an unconditional demand for the contract price, and a counter-demand for $200 as a counterclaim for increased

insurance charges suffered by delay;'' that said evidence tended to prove an admission of liability for the contract price coupled with a counterclaim for $200 for loss occasioned by increased rate of insurance, ''made when no litigation was pending or threatened, made to one who had no authority to accept it (the agent), and made without any intimation that it was confidential and without prejudice.'' The evidence was held competent. Aside from the fact that in the Moore case the offer in question was made to an agent who had no authority to accept it the decision seems to us to be in point. And we suggest, as to that fact, that the agent might have communicated the offer to his principal, and anyway we do not believe that was a controlling factor in the decision. The Moore case is cited with approval in Huttig v. Brennan, 328 Mo. 471, 41 S. W. (2d) 1054, q. v.

In Farber v. Boston Insurance Co., 215 Mo. App. 564, 256 S. W. 1079, where the defendant, at the trial, was denying liability, the court held that an offer to pay $8000, made by an adjuster for all the insurance companies interested, should have been admitted as an admission of liability, there being no evidence that it was offered as a compromise and no controversy or disagreement having arisen between the parties prior to the offer. (We shall later again refer to the Farber case.) In Mason v. Agricultural Ins. Co., 150 Mo. App. 17, 129 S. W. 472, it was held that an effort of the parties to agree upon the amount of loss and avoid the necessity of an appraisement, leaving the question of liability open, was not inadmissible as an offer of compromise. In Hunter v. Helsley, 98 Mo. App. 616, 73 S. W. 719, the defendant, by contract, was to receive from the plaintiff a stock of merchandise ''at cost and freight added.'' The court held that the efforts of the parties to determine the amount of the freight were not for the purpose of effecting a compromise but only to ascertain the amount due.

Referring again to the Farber case. It was decided by the Kansas City Court of Appeals. The same court later in Starnes v. St. Joseph Railway, Light, Heat & Power Co., 22 S. W. (2d) 73, seems to criticize and in effect overrule the Farber case, and refers to some other appellate court cases expressing like views. The Court of Appeals' opinion was not the final decision in the Starnes case. That court certified the case to this court, deeming its opinion in conflict with decisions of the St. Louis and Springfield Courts of Appeals, and here the case was decided on the merits as though originally appealed here, the decision being reported in 331 Mo. 44, 52 S. W. (2d) 852, supra. Counsel for defendants rely strongly on the Court of Appeals' opinion, which they say was affirmed by this court. But this court did not in terms affirm the appellate court's opinion. It reached the same result, but wrote its own opinion, as it does when a case reaches it in such manner. On the point we are considering, the discussion, if it may be called discussion at all, is very brief. The

court simply said, "Defendant's offer to return the $18 in exchange for a full release from plaintiff was in terms an effort to compromise an existing difference, and plaintiff's above-noted manner of refusal to accept plainly indicates that he so understood it." The court then said what we have hereinabove in substance quoted to the effect that negotiations for peaceful settlement are to be encouraged and added that the trial court should have excluded the evidence of that offer, citing cases. It did not refer to the appellate court's holding on that point or its discussion thereof, nor to the decisions which the appellate court criticized. We have read the cases cited by this court. In all of them, as in the Starnes case, there was an existing controversy or difference and the evidence held incompetent related to offers or negotiations looking to compromise or settlement thereof. The decision of this court in the Starnes case does in effect hold that an offer or effort to compromise is inadmissible though made before suit was filed, because in that case the effort was made before suit was filed, and, indeed, it appears to us that was the chief point of the Court of Appeals' opinion. With that holding we agree.

In the instant case defendants' telegram of September 23, 1920, was the first intimation from either side that there was any thought of abandoning the contract, and even that message could hardly be understood to indicate an intended *repudiation* thereof. It indicated that defendants recognized the contract as valid and in force, and only sought to know the *amount* for which plaintiffs would be willing to *cancel* it. At that time there was no controversy between the parties—nothing to settle—and without the italicized portion of that telegram, the only part thereof to which defendants objected, it could hardly be understood just what the telegram meant. It called for an answer, which was given. Not until defendants' telegram of September 24th was there a definite statement from them that they would not receive the hops and would not pay any damages—in short, a definite refusal to comply with the contract. Plaintiffs' second telegram of the 24th, in answer to defendants' message of that date, added nothing to what they said in their first telegram, except a more definite statement that they would not cancel except on payment of the sum named, it being the legal measure of damages. Plaintiffs were simply asserting and demanding what they claimed as their legal rights under the contract and there was no intimation by defendants in their telegrams that they then claimed the contract was void. In the circumstances shown we think the telegrams were admissible. Defendants' telegrams tended to show that they then recognized and admitted the validity of the contract.

III. Defendants' remaining assignment of error is that the court should have discharged the jury and declared a mistrial, at their request, and should have sustained their motion for new trial, because

of alleged misconduct of a juror, Mr. Lemon. It appears that during an intermission in the course of the trial Mr. Lemon approached Mr. James Quinn, one of plaintiffs' attorneys, extended his hand and said, "Your name is Jimmy, isn't it?" Mr. Quinn, accepting the extended hand and shaking hands with Lemon, asked him how he knew, to which Lemon replied, jocularly, "I am psychic." Nothing more was said. The incident was observed by defendants' counsel, who reported it to the court and asked that the jury be discharged, which request the court denied. On the motion for new trial the court heard evidence and made full investigation concerning that incident. It developed that a Miss Carroll worked in an office—not that of plaintiffs' attorneys—in which Lemon also worked. She and Lemon knew each other and had desks near each other. They were merely casual friends. Miss Carroll knew and was on quite friendly terms with a Mr. Goldsmith, a lawyer, who had a desk in the office of plaintiffs' attorneys, renting office space from them but not being connected with the firm. Miss Carroll occasionally, during lunch periods or after her office hours, called to see Mr. Goldsmith at said office, and in that way had met the members of the firm representing plaintiffs. On a few occasions Mr. Quinn, a member of the firm, had met Miss Carroll at places other than the office. They were only acquaintances and casual friends. Through Mr. Goldsmith Miss Carroll had learned that the firm of Johnson, Garnett & Quinn were engaged in a lawsuit, which had been in court for many years. She knew nothing of the nature of the suit or the parties thereto. She had heard of a lawsuit in which that firm had been engaged and which had been in court for a long time—the "mule case,"—and she wondered if this might be the same case. On the day the jury panel was being examined on *voir dire* she met Lemon, by chance, during the noon hour, and learned from him that a case was coming up that had been in court about twenty-two years, but he didn't know whether he would be on the jury, as he knew one of the attorneys, a Mr. Jost, one of defendants' attorneys. That evening she met Lemon when he came to the office where they worked, as she was leaving, and asked him if he was "on that jury." Being informed that he was she asked him who were the attorneys. He did not know any of them except Mr. Boatright, another of defendants' attorneys (Mr. Jost was not present that day), but from his description she concluded Mr. Quinn was one of them and said she would like to hear him argue a case, as she understood he was a very capable public speaker and had been an instructor at Harvard. Nothing was said about the facts of the case. In talking with Lemon she referred to Mr. Quinn as "Jimmy." It appears from the evidence Mr. Quinn is a popular sort of man whom everyone that knows him habitually calls "Jimmy." Mr. Lemon told her he was going to shake hands with Mr. Quinn and call him "Jimmy."

We have stated in substance the facts developed at the hearing of defendants' motion for new trial. As we have said the court investigated the matter fully. It heard the testimony of all persons who could be supposed to be able to throw light upon the subject of inquiry. After careful reading of that evidence we are convinced it tends to show nothing that would have justified the court in declaring a mistrial or in setting aside the verdict. Appellants' counsel frankly admit and the evidence clearly shows that there was nothing indicating improper or unethical conduct in anywise on the part of any of plaintiffs' counsel. They practically concede that the evidence does not really show improper conduct or motive on the part of the juror, but they suggest that Miss Carroll *may* have felt more interest in the case, because of her friendship with Goldsmith and her acquaintance with Quinn, than she disclosed in her testimony, and that the juror, perhaps even unconsciously to himself, *may* have been unduly influenced in plaintiffs' favor through his acquaintance with the young lady. The whole contention seems to us to be based on mere conjecture and suspicion, unwarranted by the facts disclosed.

The judgment of the circuit court should be affirmed. It is so ordered. *Westhues, C.,* concurs; *Bohling, C.,* concurs in paragraph II as to result.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.