CONNOR, Appellant, v. MICHIGAN WISCONSIN PIPE LINE COMPANY, Respondent.

*January 12—February 6, 1962.*

For the appellant there was a brief by *Smith, Puchner, Tinkham & Smith* of Wausau, and oral argument by *Richard P. Tinkham.*

For the respondent there was a brief by *Rieser, Stafford, Rosenbaum & Smith* of Madison, and oral argument by *Willard S. Stafford.*

CURRIE, J.   The new trial was granted upon the ground that prejudicial error had been committed in the admission of evidence.  Therefore, the issues on this appeal are whether error did occur in this respect, and if it did, whether it was prejudicial.

The easement for the pipeline extends in an east-west direction over a strip 75 feet in width across both forties of Connor's land.  It is conceded that the west forty only has value as agricultural land; that is the reason the parties were able to agree on a value of $500 for the taking of the easement across it.  With respect to the east forty, Connor adduced expert testimony that it has a unique value because it contains a large deposit of sand, ranging from 12 to 14 feet deep.  Testimony also disclosed that this sand is near the surface, is of a high quality, and could be quarried economically.  This sand is the type that can be used for ballast in highway construction and for general construction purposes.

The Connor land is situated in the northern part of Wood county, a region mostly covered by a clay soil with a hardpan underneath.  Other than a sandpit owned by one Lobner on land adjoining the Connor east forty, there is no

operating sandpit located within about eight miles of the Connor land. Connor and his two expert witnesses placed a high amount of damages with respect to the east forty because of the interference the easement would have on the quarrying of sand. Connor placed the damages at $15,000 and his two expert witnesses fixed them at $11,500 and $10,000, respectively.

The Pipe Line Company only called one expert witness. He testified that the highest and best use of the land was as agricultural property and placed Connor's damages at $465 for the taking. The evidence also indicated that during the eight years in which the Lobner sandpit had been operated only one half of the sand had been removed. This gives rise to the inference that the Lobner pit might well supply the sand needs of the community for another eight years, especially as there was no testimony that any highway-construction project was being planned locally. Furthermore, the Lobner pit was in operation in 1954 when Connor purchased the east forty at a price of $100 per acre. However, Connor testified that when he made this purchase he did not know about the sand deposit.

Sometime in 1960 after the Pipe Line Company had informed Connor of the location of the easement it would require across his land, Connor had test holes dug at different places on the strip which would be subject to the easement. These test holes disclosed the presence of the sand deposits. The Pipe Line Company had employed one Hunter to negotiate for the purchase of easement rights with the owners of lands to be crossed by the pipeline. Connor testified that after these test holes were dug he requested that Hunter meet him in the vicinity of these holes. It is at this point in Connor's testimony that the incident occurred which afforded the basis for the circuit court's action in ordering a new trial. We quote from the record as follows (Attorney Tinkham on direct examination of Mr. Connor):

"*Q.* And after the work [test holes dug] was done, and in your conversations, tell us whether or not he [Hunter] made any statement to you as to the value of the land being taken by the right of way?"

"[Attorney Stafford: Objection.] . . .

"*Q.* And what was that statement by Mr. Hunter? *A.* He said that the pipeline company was perfectly willing to pay me for the sand under the pipeline if it was shown to be there.

"*Q.* My question is what did he say concerning the value of that land so taken? *A.* He proceeded to figure the value then, and in my presence, and as I watched him, he figured it out, but he dropped one zero. I called his attention to the fact that in school I was never permitted to do it that way, and he said, well, that is the way he always did it. However, he came back to me thereafter and said that he had made a mistake—that instead of coming out at $1,000 it should have been ten as I indicated to him, but he said $1,000 was all he would pay me anyway, but that he had made a blunder in figuring it. . . .

"Mr. Tinkham: The question is, Mr. Connor, what, if anything, did he say to you as to the actual value of the land taken for the pipeline as distinguished from what he offered you or not. I want to know what he said about the actual value.

"The Court: If he said anything.

"Mr. Tinkham: If he said anything.

"*A.* When he came back the second time, he said that he had reported what he had done to his superior and regardless of his blunder, his superior said that he was to offer me $1,000."

The trial court promptly ordered this last question and answer stricken and instructed the jury to disregard them.

There can be no question but that the purpose for which Connor sent for Hunter, and for which Hunter went to meet Connor, was to negotiate a settlement whereby the Pipe Line Company would pay Connor a satisfactory price for the easement it wished to acquire across his lands. Thus, we are confronted with the question of the admissibility of

statements made by the agent of the adverse party during the course of a negotiation for settlement.

Three different bases have been advanced by the authorities for the rule of evidence excluding offers of compromise settlement. These are: (1) Relevancy; (2) contract; and (3) privilege grounded on public policy. For a discussion of these bases, and the authorities in support of each, see *Esser v. Brophey* (1942), 212 Minn. 194, 3 N. W. (2d) 3, 34 Michigan Law Review (1936), 524, and 31 Texas Law Review (1953), 239.

The relevancy ground for this rule of exclusion has received wide acceptance by the courts of this country; it is probably employed by the courts of a majority of our jurisdictions. Undoubtedly, this is to some extent due to the fact that Greenleaf, one of the early and widely read authorities on evidence, advanced this reason for the rule. 1 Greenleaf, Evidence (16th ed.), p. 321, sec. 192. Wigmore also, by reason of his great prestige, gave impetus to this theory by adopting it in his monumental treatise on evidence. We quote 4 Wigmore, Evidence (3d ed.), p. 28, sec. 1061:

"The true reason for excluding an offer of compromise is that it *does not* ordinarily proceed from and *imply a specific belief that the adversary's claim is well founded,* but rather a belief that the further prosecution of that claim, whether well founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered. In short, the offer implies merely a desire for peace, not a concession of wrong done."

Support for the rule on the ground of contract has received very little acceptance by the courts of this country, but this ground has been adopted by the English courts. These courts hold that, there is implied in the submission of an offer to compromise that such submission is "without prejudice." 1 Jones, Evidence, Civil Cases (4th ed.), p. 545 *et seq.,* sec. 291, in discussing the rule excluding

offers of compromise, states all three reasons, viz., relevancy, contract, and privilege grounded on public policy. His recognition of the contract basis for the rule is apparent from the following statement (id., p. 548) :

"But, although the courts have frequently held it proper to receive admissions of distinct facts during such a negotiation, yet if the admission is of a nature suggesting to the court that it would not have been made except for the purpose of the negotiations, and that, under an agreement fairly to be implied from the circumstances, it was not to be used to the prejudice of the party making it, it is not error to exclude the evidence."

McCormick, Evidence (hornbook series), p. 540, sec. 251, states that the true basis for the rule is privilege, not relevancy. His reasons for this conclusion are stated earlier in the text as follows (id., p. 158, sec. 78) :

"The privilege theory here seems more convincing. To a jury any substantial offer of compromise would be quite persuasive that the one who made the offer believed that the adversary's claim had substantial merit. There is nothing unreasonable in this inference, neither does it conduce to confusion of issues, undue prejudice, or unfair surprise. There is no threat to the search for truth at the trial in such evidence. The courts are protecting an interest which goes further back. If one contemplating an offer of settlement, or his attorney, knew that the offer, if refused, could be used against him, he would as a practical matter weigh this danger in the balance, and it would often turn the scale of decision against making the offer. This view that the rule excluding offers of compromise is a rule of privilege designed to encourage the settlement of disputes out of court, and not a rule of competency, is fortified by a substantial number of judicial pronouncements."

As mentioned by McCormick, there are a substantial number of court decisions which ground the rule on privilege because of the public policy which favors the settlement of

disputed claims.[1] We have yet to find a court decision holding that it is not in the interest of public policy that compromise settlement of disputed claims be encouraged. This being true, then any evidence relating to offers of settlement should be excluded on the ground of privilege. Thus, we approve of McCormick's position that this is the soundest basis for excluding evidence of offers of settlement.

Professor Tracy in his Comment, "Evidence—Admissibility of Statements of Fact Made During Negotiation for Compromise," 34 Michigan Law Review (1936), 524, and Professor Bell in his article, "Admissions Arising Out of Compromise—Are They Irrelevant," 31 Texas Law Review (1953), 239, favor grounding the rule of exclusion on privilege rather than relevancy. They further advocate that collateral admissions of parties, made during abortive efforts to negotiate a settlement, should be just as privileged as are any offers submitted. The reason for this position is well stated by Professor Bell, as follows (31 Texas Law Review, p. 257):

"The collateral admission should be excluded, even though relevant, in order to foster and give real protection to settlement negotiations. To ask parties to negotiate away their difference under conditions which compel them to state their positions in hypothetical or conditional form is so unrealistic that it borders on the farcical. Infusing reserve and dissimulation, uneasiness, suspicion, and fear into negotiations vitiates any policy of encouragement."

---

[1] *Arnold v. Owens* (4th Cir. 1935), 78 Fed. (2d) 495, 497; *Moffit-West Drug Co. v. Byrd* (8th Cir. 1899), 92 Fed. 290, 292; *Dickinson v. Dickinson* (1845), 50 Mass. (9 Metc.) 471, 474; *Ogden v. George F. Alger Co.* (1958), 353 Mich. 402, 407, 91 N. W. (2d) 288; *Bartels v. Schwake* (1922), 153 Minn. 251, 252, 190 N. W. 178; *Jacobs v. Danciger* (1939), 344 Mo. 1042, 1050, 130 S. W. (2d) 588; *Kitzke v. Turnidge* (1957), 209 Or. 563, 571, 307 Pac. (2d) 522; *Hunter v. Hyder* (1960), 236 S. C. 378, 387, 114 S. E. (2d) 493; *Eckhardt v. Harder* (1931), 160 Wash. 207, 211, 294 Pac. 981.

In order to sustain the instant holding of the trial court, that error was committed, we find it unnecessary to adopt the position taken by Professors Tracy and Bell that everything said by a party during settlement negotiations is privileged and should be excluded. However, the overwhelming weight of precedent is against invoking such an all-inclusive rule of privilege even though there may be strong reasons of logic and public policy in favor thereof. See Anno. 80 A. L. R. 919. Therefore, we ground our holding on the narrow facts presented by this record.

This court previously faced the problem here at issue in *Papke v. Haerle* (1926), 189 Wis. 156, 160, 207 N. W. 261. There it was held that evidence of offers of compromise are inadmissible but not "admissions of independent facts occurring during negotiations." In support of this holding the court cited *Richards v. Noyes* (1878), 44 Wis. 609, 611, wherein sec. 192 of 1 Greenleaf, Evidence (16th ed.), was quoted with approval. This quotation from Greenleaf reads (p. 321) : "A distinction is taken between the admission of particular facts, and the offer of a sum of money to buy peace." The court went on to stress that admissions are easily fabricated, but when "clearly established" are entitled to considerable weight. In applying these principles to the facts there at issue, the court held that there was such doubt as to whether the claimed admission had been made that no jury issue was presented with respect to the fact claimed to have been admitted during the settlement negotiation.

*Wigmore* criticizes the Greenleaf statement adopted by many courts, that a "distinct" or "independent admission of fact" made during settlement negotiations is admissible, as an inadequate expression of that part of the rule which admits "unqualified statements conceding the opponent's claim." 4 Wigmore, Evidence (3d ed.), p. 33, sec. 1062. Wigmore goes on to express the view that some courts have adopted too liberal a policy in admitting statements

made during settlement negotiations because they "give little weight to the general hypothetical nature of discussions attending a compromise negotiation." Id. In accord with this view, the New Mexico court, in *Jones v. Jernigan* (1924), 29 N. M. 399, 223 Pac. 100, held an admission by a party during settlement negotiations was hypothetical in nature and not admissible.

In the instant case there are two strong reasons why the acts and statements of Hunter, testified to by Connor, were privileged and not admissible. First, there was no clearly established statement made by Hunter that either the easement, or the value of Connor's sand deposit, was worth $10,000. The jury would have to infer from his statement, about making the blunder in his computation by dropping a zero, that he did admit the sand was worth $10,000. For the purposes of the exclusionary rule with which we are here concerned, no admission of value is *clearly established* in a situation in which a jury must resort to inference to find that such an admission was made. Second, the making of a computation as a basis for submitting an offer, as occurred here, is hypothetical in nature. Thus, the unit of value that is taken as the starting point in making the computation is also considered hypothetical.

We are of the opinion that trial courts should be particularly careful in admitting into evidence any admissions of value made during settlement negotiations. Such admissions should be held to be hypothetical in nature if it seems apparent that such value constituted the starting point leading to the submission of a definite offer, even though the ensuing offer is less in amount. The determination of whether an admission of value is hypothetical in nature is for the court to determine, not the jury. A sound policy reason exists for the application of a restrictive, rather than liberal, rule of admissibility with respect to admissions of

value, based on the fact that the opposite party is not required to resort to such admissions to prove value.

Furthermore, in the instant situation the legislature has enacted into statute the requirement that the condemnor must negotiate with the landowner for the purchase of the interest sought to be obtained before resorting to condemnation. Sec. 32.05 (2a), Stats.[2] Thus, the legislature, recognizing the public policy which encourages the settlement of controversies without resort to litigation, has made an attempt at negotiation compulsory in the field of eminent domain. Because of this, there exists here an even-stronger basis for a rule of evidence excluding, as privileged, statements by the parties in such compulsory negotiations, except such statements as are independent admissions against interest falling outside the scope of the negotiations.

There can be no question but that disclosure to the jury of any statements made by Hunter to Connor, and particularly Hunter's computation to determine the damages which would result from the taking of the easement, constituted error. Furthermore, if the trial court had not stricken the question which inquired as to what Hunter said with respect to the value of the land to be taken and Connor's answer thereto, it would be equally clear that this error was prejudicial. We do not deem that striking this particular question and answer, and instructing the jury to disregard them, cured the error and removed the prejudice. The harm had already been done. We are inclined to agree with counsel for the Pipe Line Company in his characterization of the effect thereof upon the jury as being "devastating." The jury could well have concluded that the Pipe Line Company had only offered $1,000 for the easement even though its agent's computation had disclosed it to be worth

---

[2] This statute provides: "Before making the jurisdictional offer provided in sub. (3), the condemnor shall attempt to negotiate personally with the owner or one of the owners of the property sought to be taken for the purchase of the same."

$10,000. Any instruction of the court to disregard such evidence is unlikely to have been effective. We concur in the learned trial judge's analysis, as embodied in his memorandum opinion on motions after verdict:

"As has been said by the supreme court, attempt by the trial court to cause the jury to disregard such testimony is the best that can sometimes be done under the circumstances, but in some cases, the best is still not good or effective. When the matter is heard by the jury, no one can generally hope that they can successfully erase it from their minds even though they have been instructed so to do and even though they might honestly attempt so to do. The human mind is not so constituted. It is the obligation of counsel to avoid such situations."

The briefs present the further issue of whether Hunter had actual or apparent authority to make an admission of value which would be binding upon his principal, the Pipe Line Company. Because of our conclusion that what here transpired in the negotiations between Hunter and Connor was privileged, we find it unnecessary to pass on this further issue.

*By the Court.*—Order affirmed.