BIGLEY, Respondent, v. BRANDAU and others, Appellants.

*No. 145. Submitted under sec. (Rule) 251.54 January 5, 1973.—Decided January 30, 1973.*
(Also reported in 203 N. W. 2d 735.)

For the appellants the cause was submitted on the briefs of *Charlton, Yanisch, Greco & Roffa,* attorneys, and *Earl A. Charlton* and *Carlton Roffa* of counsel, all of Milwaukee.

For the respondent the cause was submitted on the brief of *Arthur, Tomlinson & Gillman, S. C.,* of Madison.

BEILFUSS, J. The appellants assert that the judgment should be reversed in the interest of justice. This court does have the discretionary power to reverse a trial court judgment, direct entry of a proper judgment or remand for a new trial by virtue of sec. 251.09, Stats.[1] The appellants' brief does not specify whether they seek a new trial or reversal and judgment.

The rule that has been consistently followed is that this court will not exercise its discretionary power to order a new trial unless it is convinced there has been a probable miscarriage of justice and that a new trial would probably produce a different result.[2]

---

[1] **"Discretionary reversal.** In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections or exceptions appear in the record or not, and may also, in case of reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with the statutes governing legal procedure as shall be deemed necessary to accomplish the ends of justice."

[2] *Cornwell v. Rohrer* (1968), 38 Wis. 2d 252, 156 N. W. 2d 373; *Okrasinski v. State* (1971), 51 Wis. 2d 210, 218, 186 N. W. 2d 314; *Rodenbeck v. American Mut. Liability Ins. Co.* (1971), 52 Wis. 2d 682, 686, 190 N. W. 2d 917.

The defendants-appellants challenge the sufficiency of the evidence to support the jury findings that a valid contract existed and that the defendant-appellant Brandau was the agent of the other defendants-appellants.

There is a voluminous record in the matter and we will not attempt to restate all the evidence for the principal reason the test is that if there is any credible evidence to sustain the verdict it must be upheld.

While some of the facts are in dispute, the material and reliable evidence sufficient to sustain the verdict is as follows:

The plaintiff-respondent James P. Bigley was a stockholder in the Tri-County Finance Company. The appellant Harvey M. Brandau (hereinafter Brandau) became a branch manager of Tri-County Finance (hereinafter company) in February of 1966. On November 12, 1969, Brandau became the company's acting president. He was also a stockholder, director and chairman of the board. The other defendants-appellants (hereinafter defendants) were also directors, officers and branch managers of the company.

On November 17, 1969, the defendants held a company board meeting which one Attorney Endicott attended. The purpose of the meeting was twofold: First, to discuss a prior loan made to International Oil; and second, to discuss the purchase of Bigley's 995 shares of stock and some other stock of persons who are not parties to this action. At the meeting Endicott expressed his desire and Bigley's desire to sell their shares of stock in the company.[3] Endicott was acting as Bigley's agent. Both wanted to sell the stock at $20 per share across the board. Brandau stated that he was not personally interested in buying all of the stock, but rather all of the defendants were as a group. He added that the offered

[3] Endicott was an attorney on the payroll of the company, but was not a director or an employee. Bigley was not present at this meeting.

price was the lowest price and a better price than any previous discussion on this matter since March of 1969. He then asked for ten to fourteen days to see what they could do in the way of financing.

On December 2, 1969, Brandau called Endicott twice to discuss the price and terms of the sale. On December 3, 1969, the defendants again met to discuss the purchase of this stock at Attorney Keegan's office. All five of the defendants were present at this meeting. In addition, William Jirschele and Attorney Keegan were there. Mr. Jirschele was a stockholder who also wanted to sell his shares. Keegan was counsel for all of the defendants individually and as a group. The purpose of the meeting was to verify Bigley's offer and to determine whether Bigley might alter his position as to a cash sale by taking some kind of time payment. The terms and conditions of Bigley's offer were discussed out of the presence of Jirschele. During the meeting, but after the discussion, Brandau called Bigley on the phone to verify the latter's offer and to see if Bigley would alter his position by selling on a time-payment basis. Bigley told Brandau that in regard to a time payment he would just have to consult his attorney before he would make any change other than his reduced offer to sell for $15,000 cash. After the call, Brandau made out a personal check dated December 3, 1969, payable to Bigley for $15,000. He then gave Keegan the check to hold in escrow. The testimony is conflicting as to what Brandau told Keegan to do with the check. Brandau testified that he told Keegan to hold the check until he heard otherwise because they (the defendants) were still investigating the financial status of the company. Jirschele testified that when Brandau gave the check to Keegan, Brandau only told Keegan to hold the check until Bigley delivered the stock to him (Keegan) and then give Bigley the check. No other conditions, limita-

tions or reservations were imposed. Jirschele further testified that Brandau never asked for time to investigate the situation; and Brandau told him (Jirschele) at the meeting that Bigley could pick up the check from Keegan if Bigley delivered the stock to Keegan, and that Bigley was supposed to do this the next day if he wanted the check. Jirschele then called Endicott and Endicott related this message to Bigley. It is undisputed that there were no reservations, limitations or restrictions on the face of the check. The check was clearly negotiable.

Brandau then wrote similar personal negotiable checks to Endicott for $5,000, to Jirschele for $5,000, and to Dr. Boston for $5,000, as payments to purchase their stock. These three checks were then given to Jirschele to give to the respective payees. All of these checks were made out in the presence of everyone at the meeting. As Brandau wrote out these checks Jirschele would take the check and then hand over each set of stocks by placing it in front of Brandau and the other defendants on the middle of the table. Keegan was then told to hold these stocks. Throughout this entire transaction none of the defendants objected to the writing or delivery of these checks or when Jirschele handed over the stock.

The next day (December 4th) Bigley went to Keegan's office. He endorsed and delivered his stocks and Keegan gave him the check. Keegan testified that he gave Bigley the check without any condition, reservation or limitation. He then told Bigley to stop by and visit the defendants at the company's office. Keegan then called Brandau and told him that Bigley delivered the stock and that he (Keegan) gave him the check. Brandau made no objection on the phone nor did he tell Keegan to stop payment on the check. Bigley then arrived at the company's office. All of the defendants were there. Bigley shook hands and thanked each defendant per-

sonally for completing the transaction. He then offered his good wishes and assistance. Brandau knew Bigley had the check and none of the defendants expressed any objection. Brandau also testified that at that time they had no thoughts of stopping payment. He further testified that Bigley never used duress, nor were they under any pressure to carry out the transaction. Bigley left the office and deposited the check at his bank. On December 10, 1969, Brandau stopped payment but never informed Bigley of this fact.

On December 24th a meeting was held and Brandau told Bigley that he was going to make arrangements to make the check good. Bigley never saw Brandau again. The check was never made good and Bigley commenced this action. At trial Bigley testified that he still had not received the purchase price nor does he have the certificates he gave to Keegan. They were never returned to him.

With respect to Brandau's agency status: At an adverse examination, received in evidence, he testified that at the December 3rd meeting four of the five defendants were present and discussed the undertaking to purchase the stock. They were trying to figure out how they were all going to finance the purchase and how each was going to contribute for the purchase price of this stock. The reason Brandau wrote out these checks was because he felt he was supported by all the defendants. Further, it was understood between them that the stock would be distributed according to the amount of contribution. Brandau also testified that when he called Endicott on December 2d and Bigley on December 3d he was really calling on behalf of all of the directors (defendants) to see if they could get better terms of purchase.

In our opinion this evidence amply supports the jury's findings that there was an agreement to purchase the

stock for $15,000 and that Brandau was the agent for the defendants.

The defendants-appellants contend that it was prejudicial error to receive evidence as to the precarious financial condition and methods of operation of Tri-County Finance Corporation subsequent to the negotiations between Bigley and the defendants. The defendants now argue this evidence, most of it in the form of exhibits, was immaterial, irrelevant, inflammatory and prejudicial. Much of the evidence that the defendants now complain of was introduced by the defendants themselves and the rest was received without objection. Further, in motions after verdict the defendants did not move for a new trial upon the ground of error in receipt of this evidence. Because these alleged errors were not preserved in motions after verdict they are not reviewable as a matter of right.[4] Even if this had been erroneously received we do not believe it would be prejudicial to the extent that it is probable the jury would have returned a verdict favorable to the defendants.

The defendants also contend the oral contract for the sale of securities was unenforceable under the statute of frauds. The sale of securities is enforceable because the contract is an exception to the statute of frauds. As sec. 408.319 states:

"**Statute of frauds.** A contract for the sale of securities is not enforceable by way of action or defense unless: . . .

"(2) Delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment."

---

[4] *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. 2d 380, and *Cornwell v. Rohrer, supra.*

Bigley signed and delivered the securities to Keegan for the defendants, and Keegan accepted that delivery and then paid Bigley by a check which had no limitations or conditions. This is all that is required under sub. (2). No other conditions existed which would negate the application of sub. (2) when the contract was fully executed. The defendants argue that the transfer of the check is not "payment" under sub. (2), and that stopping payment of the check prevents "payment" under sub. (2). Restatement, 1 *Contracts*, p. 276, sec. 205, states that there is payment under the statute of frauds when the buyer pays the price in money or in check.[5] Corbin, *Contracts* (one vol. ed. 1952), p. 468, sec. 495, is in accord. Corbin also states in sec. 495 that: ". . . The requirements of the statute are satisfied even though the drawer of the check causes its dishonor by stopping payment . . . ." We conclude that the oral contract was enforceable because it was fully executed and the holder could maintain a suit against the drawer for the amount of the check.

Defendants next contend that the trial court erred in excluding evidence that related to the mitigation of damages. There was no error. As stated in *Smith v. Lingelbach* (1922), 177 Wis. 170, 174, 187 N. W. 1007, ". . . Upon tendering the stock to the buyer in accordance with the terms of the contract the plaintiff had, in the event of the refusal of the buyer to accept and pay for the stock, a choice of remedies: she might hold the stock for the benefit of the buyer and sue for the purchase price, or . . . ." In the instant case Bigley elected to sue for the purchase price ($15,000). He could hardly do otherwise. Neither the defendants nor their agent Keegan had ever returned the stock to Bigley. Under these circumstances there was no requirement to miti-

[5] In *Fournier v. Burby* (1959), 121 Vt. 88, 148 Atl. 2d 362, that court held payment by check constitutes payment within the meaning of the statute of frauds.

gate. There was no error by the trial court in assessing damages as a matter of law based on the facts of the case.

The defendants also complain that the court erred in receiving testimony of a proposed settlement of the lawsuit. The rule is that the court must exclude evidence of offers of compromise settlement based on the rule of privilege grounded in public policy. *Connor v. Michigan Wisconsin Pipe Line Co.* (1962), 15 Wis. 2d 614, 113 N. W. 2d 121. However, we find no testimony that the litigants attempted, negotiated or participated in any compromise settlement of the case. Contrary to defendants' contention, the purpose of the December 27th meeting was to seek a compromise settlement. In fact, Bigley did not commence legal action until January 20th when he felt Brandau would not make the check good. It was not error to admit this testimony.

Viewing the record as a whole, we find no error of substantive law so as to entitle the defendants to a reversal of the judgment. Nor do we find any prejudicial error as to procedure or admission of evidence. We believe the case was fully and fairly tried and that the real controversy between the parties has been determined. From this record we do not find sufficient reason to exercise our discretionary power to reverse the judgment or order a new trial in the interest of justice pursuant to sec. 251.09, Stats.

The plaintiff-respondent, Bigley, has noticed an appeal for a review (pursuant to sec. 274.12 (4), Stats.) of that portion of the judgment based upon an order which denied him interest from the date of the breach of the contract.

The plaintiff contends his damages were liquidated in the amount of $15,000, and that he is entitled to interest from December 4, 1969, the date of the breach of the contract.

We believe the damages were liquidated.

In *De Toro v. DI-LA-CH, Inc.* (1966), 31 Wis. 2d 29, 34, 142 N. W. 2d 192, this court adopted the rule that:

" 'The general rule is that in the absence of agreement to the contrary, liquidated damages bear interest, whereas unliquidated damages do not. 47 C. J. S., Interest, p. 28, sec. 19a; *Beck Investment Co. v. Ganser* (1951), 259 Wis. 69, 72, 47 N. W. (2d) 490. In order to recover interest there must be a fixed and determinate amount which could have been tendered and interest thereby stopped; the amount of the claim must be known and determined, or readily determinable. 47 C. J. S., Interest, p. 30, sec. 19b. Ordinarily, where the amount of a demand is sufficiently certain to justify the allowance of interest thereon, the existence of a setoff, counterclaim, or cross-claim which is unliquidated will not prevent the recovery of interest on the balance of the demand found due from the time it became due. 47 C. J. S., Interest, p. 31, sec. 19b. See also Anno. 3 A. L. R. 809.' "

And in *Thayer v. Hyne* (1951), 259 Wis. 284, 289, 48 N. W. 2d 498, this court stated:

"Defendant contends that since plaintiff made no demand for interest in the prayer of his complaint, the court erred in allowing that item. Plaintiff's claim was liquidated. He is entitled as a matter of law to interest from the time of defendant's breach, and hence it was unnecessary to allege the same as a fact or demand it in the prayer of his complaint. [Case cited.]"

In this case there was no agreement to the contrary with respect to interest. The plaintiff sued for the purchase price. This is a fixed and determinate amount which could have been tendered to stay the running of interest. The damages sought are liquidated. The plaintiff is entitled to interest from the time the contract was breached in December as a matter of law. The fact that plaintiff failed to demand interest in his complaint is of no consequence. Upon remand the judgment should be amended to provide for interest at the legal rate from December 4, 1969.

The defendants-appellants contend the plaintiff-respondent did not comply with sec. 251.34 (5) (a) and (b), Stats., in that the trial court's decision denying a motion for interest on liquidated damages was not printed in respondent's appendix. We find the error to be minimal and not prejudicial; however, because it was a violation of appellate procedural rules the respondent shall not be allowed to tax costs for the printing of his appendix.

*By the Court.*—Judgment affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with the opinion.

ROBERT W. HANSEN, J., took no part.