The ASHFORD BANK, Plaintiff,

v.

CAPITAL PRESERVATION FUND, INC. and the First National Bank of Great Falls, Montana, Defendants.

John M. BENNETT, Plaintiff,

v.

CAPITAL PRESERVATION FUND, INC. and the First National Bank of Great Falls, Montana, Defendants.

Nos. CV–80–49–GF, CV–80–128–GF.

United States District Court,
D. Montana,
Great Falls Division.

July 1, 1982.

Edward C. Alexander, Alexander & Baucus, Great Falls, Mont.; Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for plaintiff Ashford Bank.

Robert M. Kampfer, Great Falls, Mont., for plaintiff John Bennett.

Robert J. Vermillion, Swanberg, Koby, Swanberg & Matteucci, Great Falls, Mont., for defendant Capital Preservation Fund, Inc.

James E. Aiken, Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for defendant First Nat. Bank.

## MEMORANDUM OPINION AND ORDER

HATFIELD, District Judge.

Defendant in the above-captioned consolidated cases, First National Bank of Great Falls, Montana, has filed a motion for summary judgment in both actions pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The issues raised by the motions filed in the respective actions, having been briefed by the parties, are now ripe for disposition.

## FACTUAL BACKGROUND

The above-captioned cases involve nine checks, with a total face value of 5.4 million dollars, which were signed by John M. Bennett. The checks were drawn on the account of Capital Preservation Fund, Inc., maintained with the First National Bank of Great Falls, Montana. John Bennett was an authorized signatory on the account. The checks were endorsed and deposited by John M. Bennett in another account which Bennett maintained with the Ashford Bank of Houston, Texas.

The Ashford Bank sent the checks at issue through normal banking channels, *i.e.*, the Federal Reserve System, in order to obtain payment from First National Bank. In the meantime, Ashford Bank extended cash to Bennett in reliance on the checks. The checks, however, were dishonored by First National Bank.

Ashford Bank, upon learning of the dishonor, charged back the account of Bennett. Ashford Bank, however, alleges that it sustained a loss of approximately $500,000. The loss allegedly sustained prompted Ashford Bank to file suit against both Capital Preservation Fund, Inc. and First National Bank.

Subsequent to the filing of the suit by Ashford Bank, Bennett filed suit against the same parties.

For purposes of disposition of the present motions for summary judgment, the court need only address the claims against First National Bank in the respective actions.

*Ashford Bank's Claim Against First National Bank*

Ashford Bank alleges that First National Bank did not return the checks at issue within the time allowed by law. Specifically, Ashford Bank relies on the "midnight deadline" rule of the Uniform Commercial Code, codified in Montana as § 30–4–104(h) M.C.A. (1979).[1] Ashford Bank maintains that First National Bank, as the "payor bank", is accountable to Ashford Bank, as the "collecting bank", for the face amount of the checks under § 4–213(1) Uniform Commercial Code, codified in Montana as § 30–4–213(1) M.C.A. (1979).[2]

First National Bank contends that it received the checks at issue on Friday, November 17, 1978. Under § 30–4–104(h) M.C.A. (1979), First National Bank would have had until midnight of November 20, 1978, the "next banking day", to honor or return the checks.

First National Bank has filed with the court an affidavit of an employee of the Helena Branch of the Federal Reserve Bank of Minneapolis which unequivocally establishes that the First National Bank returned the checks in advance of the "midnight deadline".

■ It is the conclusion of the court that First National Bank complied with the requisites of the Uniform Commercial Code in returning the checks as unpaid before midnight of November 20, 1978 and, as such, is entitled to summary judgment as a matter of law as against the claim of Ashford Bank. It is further noted that Ashford Bank has informed the court of its intent not to oppose First National Bank's motion for summary judgment.

*John M. Bennett's Claim Against First National Bank*

John Bennett wrote the checks at issue, designating himself as payee. Bennett subsequently endorsed the checks and deposited them in the account he maintained with Ashford Bank. Ashford Bank extended cash to Bennett in reliance on the checks in an amount equal to the face value of the checks. When the checks were returned unpaid, Ashford Bank charged back Bennett's account for the amount of the checks.

---

1. § 30–4–104(h) M.C.A. (1979) provides:

     "Midnight deadline" with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later.

2. § 30–4–213(1) M.C.A. 1979 provides:

     An item is finally paid by a payor bank when the bank has done any of the following whichever happens first:
     (a) paid the item in cash; or
     (b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearinghouse rule or agreement; or
     (c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or
     (d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule or agreement. Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

Bennett's claim against First National Bank is premised on the contention that payment on the checks became final and hence, First National Bank is accountable for the amount of the checks under § 30–4–213(1) M.C.A. (1979). Bennett contends that in determining whether First National Bank is accountable for the face amount of the checks to both the "collecting bank", *i.e.*, Ashford Bank, and to Bennett, the court may find that either (1) the checks were returned after the "midnight deadline", or (2) that payment became "final" pursuant to § 30–4–213(1)(c) M.C.A. (1979) because the First National Bank completed the process of "posting" the checks. *See*, § 30–4–109 M.C.A. (1979).

The court's disposition of Ashford Bank's contention that First National Bank failed to comply with the "midnight deadline" requirement of the Uniform Commercial Code evinces the fact that Bennett may not pursue his claim against First National on that basis.

The issue of whether payment became "final" pursuant to First National Bank having completed the process of "posting" does not lend itself to such ready disposition. Bennett contends that First National Bank completed the process of "posting" the checks and therefore, payment became final as set forth in subsection (1)(c) of § 30–4–213 M.C.A. (1979).

■ Bennett is correct in his assertion that the issue of whether the "posting" process was completed presents a question of fact which precludes summary judgment. *Southeastern Pipeline Service, Inc. v. The Citizens and Southern Bank*, 617 F.2d 67 (5th Cir. 1980). It is the opinion of the court, however, that the propriety of Bennett's claim must be subjected to closer scrutiny prior to the court reaching the issue of whether payment became "final" under the purview of § 30–4–213(1)(c) M.C.A. (1979).

Bennett contends that his action is premised on the rights afforded him under § 30–4–212(1) M.C.A. (1979) which provides:

If a collecting bank has made provisional settlement with its customer for an item and itself failed by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank must revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. *These rights to revoke, charge back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final* (subsection (3) of 30–4–211 and subsections (2) and (3) of 30–4–213). (Emphasis supplied.)

Bennett submits, therefore, that since payment of the checks became final, the right of Ashford Bank to charge back his account terminated and First National Bank became accountable to Ashford Bank, which in turn is accountable to Bennett pursuant to § 30–4–213(3).[3]

The briefing of the parties submitted in conjunction with First National Bank's motion for summary judgment have failed to adequately address the legal issue of whether First National Bank is accountable to John Bennett under § 30–4–213, even assuming that payment of the checks at issue was in fact "final".

First National Bank seeks to impress upon the court that finality of payment is only applicable to holders in due course or persons who have in good faith changed their position in reliance on the payment. The contention of First National Bank in this regard would have this court read the

---

**3.** § 30–4–213(3) M.C.A. (1979) provides:

If a collecting bank receives a settlement for an item which is or becomes final (subsection (3) of 30–4–211, subsection (2) of 30–4–213) the bank is accountable to its customer for the amount of the item and any provisional credit given for the item in an account with its customer becomes final.

requirements of § 30–3–418 M.C.A. (1979)[4] into § 30–4–213. The court is of the opinion that the holder in due course and reliance requirements of § 30–3–418 should not be read into § 30–4–213. *See,* White and Summers, Uniform Commercial Code (2nd ed. 1980), § 16–2 at 613–618 and cases cited therein; *contra, Bank of Wyandotte v. Woodrow,* 394 F.Supp. 550 (E.D.Mo.1975). This conclusion, however, does not serve to terminate the court's inquiry. The factual situation presented by the relationship between John Bennett and Capital Preservation Fund, Inc., and the account maintained at First National Bank raises serious questions as to the propriety of the claim of John Bennett against First National Bank.

The account on which the checks were drawn was maintained by Capital Preservation Fund, Inc. at First National Bank. Checks were issued to numerous authorized signatories who could draw on the account in a manner similar to a simple checking account. John Bennett, as one such signatory, wrote the checks at issue designating himself as payee. John Bennett now seeks to hold the bank accountable for the face value of the checks, alleging that payment became "final" prior to dishonor of the checks by First National Bank.

In addressing the propriety of applying § 30–4–213 to the factual situation presented, the court finds a lack of substantial precedent. Therefore, in determining whether John Bennett may pursue his claim via § 30–4–213, the court must analyze the entire situation in light of the applicable sections of the Uniform Commercial Code.

The design of § 30–4–213 provides that "final" payment by a drawee bank is the point at which all "provisional" settlements, as allowed by § 30–4–104(j), in the bank collection chain become "final" settlements. In the typical situation, as the one presently before the court, provisional credits given through a clearinghouse or mutual bank account are made final upon payment of the item by completion of the process of posting the drawer's account. § 30–4–213(2). The agency relationships established under § 30–4–201 are thereby transformed into a series of debtor-creditor relationships ending with the depository bank, which is now indebted to its customer for the amount of the item. § 30–4–201 Comment 4. Once settlement becomes final, the drawee bank and each prior collecting bank is accountable to its customer for the amount of the item. § 30–4–213(3). In summary, what begins as a series of agency relationships is transformed into a series of debtor-creditor relationships under which each bank is accountable for the amount of the item to its transferor. In that regard, the right of a collecting bank, under § 30–4–212(1), to charge back the account of its customer for any credit given for an item terminates when payment on the item becomes "final".

The purpose of § 30–4–213 is to hold a "payor" bank accountable for an item once "final" payment has been rendered. The section is designed to protect third parties who, in good faith, receive an instrument for the payment of money and either present that instrument for payment or deposit the instrument in another bank, which in turn presents the instrument for payment. The "payor" bank must act in a timely manner in either paying or dishonoring the instrument. If the "payor" bank does not so act, or in fact makes "final" payment, it is accountable for the face amount of the instrument under § 30–4–213(1) to the presenter. Each collecting bank is in turn accountable to its presenter.

John Bennett contends that payment of the checks at issue by First National Bank was "final" because the process of "posting" the checks was complete. If payment was "final", the right of Ashford Bank to charge-back Bennett's account terminated and the provisions of § 30–4–213 were trig-

---

**4.** § 30–3–418 M.C.A. (1979) provides:

Except for recovery of bank payments as provided in the Article on Bank Deposits and Collections (Article 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

gered. As a result, Bennett submits, First National Bank was accountable to Ashford Bank for the face value of the checks, under § 30–4–213(1), and Ashford Bank was, in turn, accountable to Bennett.

At first blush, it appears that John Bennett would be entitled to the protections afforded a payee by § 30–4–213. The court's analysis of § 30–4–213 leads it to conclude otherwise.

In stating his claim, Bennett assumes a dual role with respect to the checks at issue. First, Bennett claims that in writing the checks he was merely acting in behalf of Capital Preservation Fund, Inc., as an authorized signator and, therefore, Capital Preservation must be considered as the "drawer" of the checks. He next contends, however, that he must nevertheless be considered the "payee" of the checks and thus entitled to the rights afforded a "payee" under § 30–4–213.

In assessing the propriety of Bennett's claim, the court refuses to simply be bound by the labels which might be attached to the parties involved in the transaction. Rather, when presented with a situation which cannot be neatly "pigeon-holed", it is incumbent on the court to reach the substance of the entire factual situation. The claim of Bennett presents such a situation.

Assume, for purposes of analysis, the following scenario:

Mr. Kite draws a check for "X" amount of dollars on an account maintained at Bank A ("payor" bank), designating himself as "payee". Mr. Kite next deposits that check in an account at Bank B ("collecting" bank), and receives credit at the latter bank. Assume further, that Bank A returns the check NSF, *i.e.*, insufficient funds, but the return occurred after Bank A had completed its process of posting the check, hence making payment "final" under § 30–4–213(1)(c). Bank B, upon receipt of the dishonor, charges-back Mr. Kite's account. Does this mean that Mr. Kite has a cause of action against Bank A for the face value of

the check under § 30–4–213? A cursory analysis of § 30–4–213 may lead one to conclude that a cause of action does in fact exist.

A review of § 30–4–212 would reveal that Bank B's right to charge back Mr. Kite's account terminated at the point in time payment by Bank A became "final". Bank A, on the other hand, would be accountable under § 30–4–213(1) to Bank B. Finally, Bank B would be accountable to Mr. Kite under § 30–4–213(3). Employing this simple analysis of the pertinent sections of the Uniform Commercial Code would result in Mr. Kite receiving a windfall of "X" dollars.

An analysis of the foregoing hypothetical situation in terms of the entire Uniform Commercial Code, however, results in a different conclusion. To begin with, the check of Mr. Kite was an NSF check. Whenever a "drawee" bank pays an NSF check it has the right to charge the drawer's account even though the charge creates an overdraft. § 30–4–401(1) M.C.A. (1979).[5] Comment 1 to § 30–4–401 establishes that the drawee has a cause of action for the overdraft against its depositor since the draft carries an implied promise to reimburse the drawee. If Bank A, in our hypothetical, was held accountable for the face amount of Mr. Kite's check, it would simply have to charge the account on which the check was drawn, under § 30–4–401, in order to recoup the amount paid. The action of Bank A in charging Mr. Kite's account would be appropriate, regardless of the fact that payment was made pursuant to § 30–4–213.

The foregoing analysis evinces that any cause of action Mr. Kite appeared to have under § 30–4–213 against Bank A is illusory since there exists a circuitous route of accountability. The only cause of action which Mr. Kite would have against Bank A would be an action for wrongful dishonor, if in fact the dishonor was unwarranted. *See,* § 30–4–401 M.C.A. (1979).

5. § 30–4–401(1) M.C.A. (1979) provides:

As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.

The court is convinced that § 30–4–213 was not designed for implementation in the factual situation where the "payee", who seeks to hold the bank accountable, is also the party who wrote the check on which the action centers.

The court fails to perceive any legitimate distinction which may be drawn between the foregoing hypothetical and the factual situation presently before the court. Bennett assumes that once a determination is made that payment of the checks at issue was final, he is entitled to 5.4 million dollars under § 30–4–213 and inquiry into the matter is terminated. To accept the proposition advanced would result in a windfall of 5.4 million dollars to Bennett. The court's analysis of the situation reveals a circuitous route of liability essentially identical to that contained in the hypothetical posed.

Bennett seeks to impress upon the court that since the account on which the checks at issue were drawn was not his account, but was actually Capital Preservation Fund, Inc., that he should properly be categorized as a third party payee for purposes of § 30–4–213. As noted, the court refuses to determine the propriety of Bennett's claim on the basis of the legalistic labels which might be attached to the parties involved. Rather, the substantive realities of the situation must control.

Assuming, for purposes of analysis, that payment of the checks at issue was "final", First National Bank would be accountable for the face amount of the checks under § 30–4–213. If required to pay the face amount of the checks, First National Bank would simply have to charge the account on which the checks were drawn under § 30–4–401 in order to recoup the amount paid.

The question arises whether the cause of action accruing under § 30–4–401 to First National Bank as a result of the overdraft would be properly maintainable against Capital Preservation Fund, Inc. or John Bennett. Assuming the action would properly lie against Capital Preservation Fund, Inc., that entity would in turn have a cause of action against John Bennett for recovery of the money.

If, on the other hand, the cause of action accruing to First National Bank would properly lie against John Bennett, then a circular route of liability would result, i.e., First National Bank being accountable to John Bennett under § 30–4–213, who in turn is liable to First National Bank under § 30–4–401(1). Final recovery by John Bennett could only be had against Capital Preservation Fund, Inc., if in fact the money for which the checks were written had been deposited by John Bennett with Capital Preservation Fund, Inc.

The foregoing analysis evinces the fact that any litigation emanating from the unique factual situation presented properly lies between Capital Preservation Fund, Inc. and John Bennett. Any cause of action against First National Bank is merely illusory. A proper determination of the rights and liabilities flowing from the factual situation presented can ultimately be had only between Capital Preservation Fund, Inc. and John Bennett.

Acceptance of the theory advanced by John Bennett would result in this court condoning what it perceives as facetious litigation, something which this court is not prepared to do. The court's ruling in this matter is limited to the claim of John Bennett against First National Bank under the factual situation presented. It is not the intention of the court to intimate any view with respect to the claims of Ashford Bank or John Bennett against Capital Preservation Fund.

For the reasons set forth herein, IT IS HEREBY ORDERED:

1. That the motion for summary judgment of First National Bank as against the claim of Ashford Bank is GRANTED.

2. That the motion for summary judgment of First National Bank as against the claim of John M. Bennett is GRANTED.