Nina Smock **HILL**, Plaintiff-Respondent and Cross-Appellant,

v.

**MERCANTILE FIRST NATIONAL BANK OF DONIPHAN,** Defendant-Appellant,

v.

**Michael SMOCK, Third Party Defendant-Respondent.**

No. 13936, 13948.

Missouri Court of Appeals, Southern District.

June 10, 1985.

Motion for Rehearing or to Transfer Denied June 28, 1985.

Application to Transfer Denied Aug. 7, 1985.

L. Joe Scott, Daniel T. Moore, Poplar Bluff, for defendant-appellant.

Ralph R. Bloodworth, Jr., John H. Bloodworth, Bloodworth & Bloodworth, Poplar Bluff, for plaintiff-respondent and cross-appellant.

FLANIGAN, Judge.

A husband and wife, on the verge of divorce, had a joint checking account at a bank. Late Friday afternoon, after the bank's "cut-off" hour, the wife wrote an $18,000 check on the account, gave it to the bank, and in return received $500 in traveler's checks (for which a $5.00 service fee was charged by the bank), and a deposit ticket reflecting the deposit of $17,495 in a new checking account which she opened in her name alone. On Monday the husband wrote a check in the amount of $20,649.95 on the joint account, gave it to the bank, and received $500 in cash and a cashier's check in the amount of $20,149.95. The joint account was insufficient to pay both checks but was sufficient to pay either. On Tuesday the bank notified the wife that her check was dishonored. She brought this action against the bank and the bank brought a third party proceeding against the husband. The dispositive issue is the propriety of the bank's dishonoring of the wife's check.

Plaintiff Nina Smock, now Nina Smock Hill, brought this action against defendant Mercantile First National Bank of Doniphan. The petition alleged that the bank "negligently and wrongfully, willfully and wantonly and intentionally and with knowledge and bad faith refused to honor plaintiff's Check No. 908 in the amount of $18,000, drawn on her joint Account No. 309494." The petition sought $18,000, plus interest, as actual damages and $150,000 as punitive damages.

The bank's answer pleaded, "for its affirmative defense," that the bank "has the right of charge back or refund as provided under the Uniform Commercial Code" and that the bank "had not made final payment of item in accordance with the Uniform Commercial Code, therefore the bank had the right to withdraw said payment."

The trial court, sitting without a jury, found the issues generally in favor of the plaintiff and against the bank, awarded Nina $2,200 in actual damages, and denied Nina's request for punitive damages. A third party proceeding filed by the bank against Michael Smock, Nina's husband at the time Check No. 908 was written and now her ex-husband, was resolved against the bank and the bank does not appeal from that feature. Both Nina and the bank appeal from the judgment entered on the petition.

The trial court made findings of fact and conclusions of law including the following:

The bank's business closed at 2:00 P.M. All transactions after this time would be reflected as the next business day.

On Friday, March 14, 1980, at 3 P.M., Nina went into the bank and presented a check for $18,000 after first inquiring into the amount on deposit. Nina took $500 of the check proceeds in traveler's checks and was charged $5.00 for this service. The remaining $17,495 was deposited by Nina in an account in her name.

The bank had no in-house computer and all checks were processed in Sikeston, Mo. After processing the checks were returned to the bank the following day.

The bank made final payment on Nina's check on Friday, March 14, 1980, when it furnished Nina with traveler's checks in the amount of $500. This was a payment in cash and under § 4–213(1)[1] is a final payment.

On her appeal Nina contends that she was entitled to $18,000, not merely $2,200, in actual damages; that she was also entitled to punitive damages; and that the trial court erred in not making those awards. On its appeal the bank contends that there was no wrongful dishonor of Nina's check; that the bank gave only provisional credit to Nina's check subject to final payment; and that it timely and properly revoked that provisional credit because the bank had made "final payment" of "the intervening priority check" of Michael.

Prior to the significant events, Nina and her husband Michael opened a joint checking account 309494 at the bank. On March 14, 1980, when the balance of the account exceeded $20,000, Nina wrote, on that account, Check No. 908 in the amount of $18,000 payable to herself. On the same date Nina opened, in her sole name, checking account 338362. Using Check No. 908,

which she endorsed, Nina purchased from the bank $500 worth of traveler's checks on which the bank charged a service fee of $5.00. The balance of Check No. 908, $17,495, was deposited in Nina's new checking account 338362, and the bank gave Nina a "checking account deposit ticket" reflecting the deposit of "$18,000, less $505, for a total of $17,495."

The signature card signed by Nina in opening account 338362 included this language: "This Bank may charge back, at any time prior to midnight on its business day next following the day of receipt, any item drawn on this Bank which is ascertained to be drawn against insufficient funds or otherwise not good or payable." The checking account deposit ticket, which the bank gave Nina, contained this language: "Checks and other items are received for deposit subject to the terms and conditions of this Bank's collection agreement."

On Monday, March 17, 1980, Michael wrote, on account 309494, Check No. 909 in the amount of $20,649.95, payable to himself. Using Check No. 909, Michael obtained from the bank $500 in cash and a cashier's check of the bank in the amount of $20,149.95, payable to himself. Michael deposited the cashier's check at a savings and loan association.

The bank was at Doniphan and its computer center was at Sikeston. Nina's check and Michael's check were taken by bank courier, after the close of business Monday, to Sikeston for processing on Tuesday. At Sikeston the decision was made by the bank to honor Michael's check and dishonor Nina's.

On Tuesday, March 18, 1980, the bank sent a telegram to Nina, at the California address she had given the bank in opening account 338362. The telegram read: "Be advised that your check number 908 for transfer of funds is insufficient balance of

**1.** Unless otherwise indicated all statutory references are to the Uniform Commercial Code contained in Chapter 400, RSMo 1978. As an example, § 4–104 of the Uniform Commercial Code has, for its Missouri counterpart, § 400.4–104.

Account Number 338362 invalid. Mercantile First National Bank."

Also on March 18, 1980, the bank sent Nina a letter which read:

This letter is to confirm our advice by wire to you on March 18 advising that your check # 908 in the amount of $18,000 has not cleared due to insufficient funds. A check also in the work the same date liquidated the funds in the account prior to your check presentation.

Therefore, your balance registered in account # 338362 in the amount of $17,495.00 is invalid. Also, we will need for you to reimburse to us the amount of $505.00 which was given to you at the opening of the account.

On March 19, 1980, the bank sent Check No. 908 back to Nina.

On the day she wrote Check No. 908, Nina left for California. She and Michael were divorced on September 15, 1980. Nina testified that she stayed in California two and one-half months and had to borrow $2,200 from her parents. The bank offered evidence that the savings and loan account, opened by Michael, had a balance of $18,000 at the time of the divorce and that Nina received her marital share of the $18,000.

The trial court found that the bank made a final payment of Nina's check within the meaning of § 4–213 [2] by furnishing her with traveler's checks in the amount of $500. This, said the trial court, was a payment "in cash" under § 4–213(1)(a). Nina advances the same argument in this court.

On the other hand the bank argues that Nina's check was not paid in cash and that, at least with respect to the $17,495 deposited in Nina's individual account, the bank made a provisional settlement within the terms of § 4–213(1)(d) and that the bank revoked the settlement in the time and manner permitted by statute.

■ It is unnecessary to determine the respective merits of those conflicting contentions.[3] For the reasons which follow, this court holds that the bank properly honored Michael's check and was entitled to accord it priority over Nina's check. This court also holds that Nina, as the drawer and payee of Check No. 908, was not entitled, as against the bank, to rely upon the "final payment" concept of § 4–213; that the bank was entitled to charge Nina's check against the joint account even though Nina's check was an overdraft; that Nina thereby became the debtor of the

2. Section 4–213 reads, in pertinent part:
"(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
(a) paid the item in cash; or
(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or
(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or
(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.
Upon a final payment under subparagraph (b), (c) or (d) the payor bank shall be accountable for the amount of the item."

3. Even if the traveler's checks were viewed as equivalent to cash, a matter unnecessary to decide, they represented only a portion of the manner in which Nina's check was paid. Nina has had the benefit of the $500 in traveler's checks, and the $5.00 service charge she paid to

obtain them, and the bank has not counterclaimed for that $505 portion of Check No. 908. It seeks only to justify its conduct in taking credit for $17,495 against the balance of Nina's individual account.

In *Kirby v. First and Merchants National Bank,* 210 Va. 88, 168 S.E.2d 273 (1969), the check of a third person, in the amount of $2,500, named Kirby as payee and was drawn on the plaintiff bank. Kirby presented the check to the plaintiff bank, received $200 in cash, and her account in that bank was credited with $2,300. The court held that the bank had paid the check in cash and thereafter had no right to charge Kirby's account with the amount of the check, for which there was insufficient funds. It based its ruling on a finding that the deposit was made in cash—evidenced by the word "currency" before "$2,300" on the deposit ticket, and by the words "cash for deposit" on the back of the check. Two judges dissented and were of the opinion that the check had not been paid in cash. The holding of the majority has been criticized. See White-Summers, Uniform Commercial Code, 2d Ed., p. 697, fn. 151.

bank and that the bank could set off the amount of that debt, $18,000, against the $17,495 balance of Nina's new account, and properly did so.

Certain definitions used in the Uniform Commercial Code must be mentioned. Nina's check was signed by Nina, the drawer, contained an unconditional order to pay a sum certain in money, was payable on demand, and was payable to order. It thus was a negotiable instrument, § 400.3–104(1) and, because it was an order, it was a draft, § 3–104(2)(a), and, because it was a draft drawn on a bank and payable on demand, it was a check, § 3–104(2)(b). The check was payable to order even though it was payable to the order of Nina, the drawer, § 3–110(1)(a). The check was an "item" because it was an instrument for the payment of money, § 4–104(1)(g).

The bank, with respect to Nina's check, was a "payor bank" because it was the bank by which Nina's check was payable as drawn, § 4–105(b). It is important to keep in mind that Nina was both the drawer and payee of the check.

With respect to the joint account, both Nina and Michael were "customers" because they had a joint checking account with the bank, § 4–104(1)(e), and the word "account" means any account with the bank, including a checking account, § 4–104(1)(a).

The bank introduced evidence that it had fixed 2 o'clock as its cut-off hour. The trial court properly found that the cut-off hour had been so fixed and that Nina's presentation of Check No. 908 to the bank took place on Friday afternoon after the cut-off hour. Since the bank was closed on Saturday and Sunday, the bank could and did treat Nina's check as being received at the opening of the next banking day, Monday, § 4–107(2). Because of the bank's cut-off hour, Nina's Check No. 908 and Michael's Check No. 909 were both Monday checks.

The joint account was insufficient to pay both of them.

Section 4–303 reads, in pertinent part:

(2) Subject to the provisions of subsection (1) items may be accepted, paid, certified or charged to the indicated account of its customer in any order convenient to the bank.

It should be noted that the foregoing statute speaks in terms of "any order convenient to the bank" and does not require a valid explanation for paying one check in preference to another where the account is insufficient to pay both. The bank president did, however, explain why it was Nina's check rather than Michael's check which was dishonored. A cashier's check in the amount of $20,149.95 was issued to Michael. That check, together with the $500 paid Michael in cash, represented the balance in the joint account if Nina's check was not in the picture. The president testified that a cashier's check "is the same as paying cash"[4] and that a check exchanged for a cashier's check has a "priority code—number 60" stamped on it by the bank. The purpose of stamping the priority code on Michael's check was to inform the computer center in Sikeston, where both checks were processed on the same day, Tuesday, that it was a priority item and was to be paid prior to the payment of other checks, like Nina's, not bearing the priority code number.

In Anderson, Uniform Commercial Code, 3d Ed.,[5] Vol. 7, § 4–303:6, p. 133, in discussing § 4–303, it is said:

When the account is insufficient to pay all items, the bank may charge items against the account in any order convenient to the bank.

When A and B have a joint checking account, the bank is not liable to A for wrongful dishonor of his check when it received A's check and then paid most of

---

**4.** "When a bank receives its customer's check and issues a cashier's check in return, there is a payment 'in cash' and the bank cannot thereafter revoke the settlement." Anderson, Uniform Commercial Code, 3d Ed., Vol. 7, § 4–213:4(a), p. 87.

**5.** The foregoing treatise will be referred to, in subsequent citations in this opinion, as "Anderson."

the balance of the account to B on B's check, after which it dishonored A's check for insufficient funds, because a bank may charge against an account any item which is otherwise properly payable from it, and the bank was entitled to defer payment of A's check until the close of that business day in order to verify the account, even though payment was made on B's check during the delay interval.

Accordingly the bank properly could charge Michael's check against the joint account and give it priority over Nina's check,[6] as it did.

Nina argues, however, and the trial court found, that the bank made "final payment" of Nina's check within the meaning of § 4–213, set forth in footnote 2. The trial court found that Nina's check was paid in cash as contemplated by § 4–213(1)(a). Nina makes that contention and also advances the argument that the bank made final payment because it had completed the process of posting the item to the indicated account of Nina, as contemplated, so the argument runs, by § 4–213(1)(c). The flaw in those contentions is that the concept of final payment, as embraced within § 4–213, is not available to Nina with respect to Check No. 908.

Nina was the drawer and the payee of Check No. 908. "When the same person is the drawer and the payee, he can not assert a right against the drawee bank based on § 4–213." Anderson, Vol. 7, § 4–213:3, p. 86.

The foregoing principle was applied in *Ashford Bank v. Capital Preservation Fund, Inc.*, 544 F.Supp. 26 (D.C.Mont. 1982). There one Bennett, an authorized signatory on a checking account in the defendant bank, drew nine checks on the account. Bennett was himself the payee of the checks. He endorsed them and deposited them in his account in another bank. Defendant bank dishonored the checks and Bennett brought an action against the defendant bank claiming that it had completed the process of posting the checks and therefore payment became final as set forth in § 4–213(1)(c).

The court said that the purpose of § 4–213 was to hold a payor bank accountable once final payment has been rendered.

The section is designed to protect *third parties* who, in good faith, receive an instrument for the payment of money and either present that instrument for

---

**6.** Some Uniform Commercial Code commentators have the view that if the bank had paid Nina's check first, then paid Michael's check, Nina would be responsible for the overdraft created by the payment of Michael's check. They base their position on the language of § 4–401 which reads, in pertinent part:

"(1) As against its customer, a bank may charge against his account any item which is otherwise properly payable from the account even though the charge creates an overdraft."

The commentators assert that § 4–401(1) authorizes a bank to charge the payment of an overdraft to all members of an overdrawn joint account.

See B. Clark, The Law of Bank Deposits, Collections & Credit Cards, [Rev.Ed.1981], paragraph 2.8(4); W. Hawkland, A Transactional Guide to the Uniform Commercial Code (1964), 385–386. Another commentator, however, has stated that a co-signatory cannot be held liable for overdrafts beyond the balance of the joint account. R. Anderson, Uniform Commercial Code, § 4–401:4, at 300 (1971).

The joint account agreement contained on the signature card signed by Nina and Michael when account 309494 was opened does not contain language addressing the issue of whether Nina or Michael may be held liable for the overdrafts of the other. There is language, arguably dictum, in Missouri to the effect that each of the joint account holders would be liable for the overdraft of the other. *Bremen Bank & Trust Co. v. Bogdan*, 498 S.W.2d 306, 310 (Mo.App.1973).

The Supreme Court of New Hampshire has held that a wife, who did not participate in the transaction creating the overdraft of her husband on a joint account and who did not receive funds as a result of the overdraft, could not be held liable for the payment of it. *Cambridge Trust Co. v. Carney*, 115 N.H. 94, 333 A.2d 442 (1975). To similar effect see *United States Trust Co. of New York v. McSweeney*, 91 A.D.2d 7, 457 N.Y.S.2d 276 (1982).

In the case at bar the bank paid Michael's check, for which there was sufficient funds, and no issue is raised concerning any possible responsibility of Nina to pay an overdraft created by Michael.

payment or deposit the instrument in another bank, which in turn presents the instrument for payment. The "payor" bank must act in a timely manner either in paying or dishonoring the instrument. If the payor bank does not so act, or in fact makes "final" payment, it is accountable for the face amount of the instrument under [§ 4–213(1) ] to the presenter. Each collecting bank is in turn accountable to its presenter.

(Emphasis added). 544 F.Supp. at 29.

The court pointed out that whenever a drawee bank pays an insufficient funds check it has the right to charge the drawer's account even though the charge creates an overdraft. § 4–401(1).

At p. 31 the court said:

The court is convinced that [§ 4–213] was not designed for implementation in the factual situation where the "payee", who seeks to hold the bank accountable, is also the party who wrote the check on which the action centers.

.    .    .    .    .

Assuming, for purposes of analysis, that payment of the checks at issue was "final", [defendant bank] would be accountable for the face amount of the checks under [§ 4–213]. If required to pay the face amount of the checks, [defendant bank] would simply have to charge the account on which the checks were drawn under [§ 4–401] in order to recoup the amount paid.

The court held that Bennett had no cause of action for wrongful dishonor against the defendant bank and that his claim was "merely illusory." ·

Section 4–401(1) reads: "As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft." "An item is properly payable when it is signed with a genuine or authorized signature of the drawer, and all endorsements are genuine or authorized...." Anderson, supra, § 4–401:12, p. 141. Under § 4–401

the bank, as against Nina, could charge against the joint account Nina's Check No. 908, which was otherwise properly payable from that account, although the charge created an overdraft.

■  The payment of an overdraft constitutes a loan by the bank to the drawer of the overdraft, a loan for which the drawer is liable. *United States Trust Company of New York v. McSweeney*, 91 A.D.2d 7, 457 N.Y.S.2d 276 (1982); *First Citizens Bank & Trust Co. v. Perry*, 40 N.C.App. 272, 252 S.E.2d 288, 290 (1979). Comment 1 to § 4–401 reads: "It is fundamental that upon proper payment of a draft the drawee [bank] may charge the account of the drawer [Nina]. This is true even though the draft is an overdraft since the draft itself authorizes the payment for the drawer's account and carries an implied promise to reimburse the drawee."

It should be noted that in charging back Check No. 908 against the balance of Nina's checking account 338362, and in doing so prior to midnight Tuesday, the bank was merely exercising the right which was expressly given to it by Nina's signature card in opening account 338362. Moreover, applying the rationale of *Ashford Bank*, supra, that provision, although complied with, may not have required compliance for it probably contemplated a situation where the drawer of the check was some person other than the payee.

Subject to exceptions inapplicable here, a bank may setoff deposits in its hands against the matured indebtedness of its depositor. This right grows out of the debtor and creditor relationship existing between the bank and its depositor and the bank has the right to apply a deposit to payment of the depositor's matured debts or obligations held by the bank, in the same way that another debtor might assert setoff as a defense to an action on the debt.

*Kaw Valley, Etc. v. Com. Bank of Liberty*, 567 S.W.2d 710, 712 (Mo.App.1978).

Discussing a bank's right of setoff under the Uniform Commercial Code, it has been said: "[T]he act of setoff is not complete

until three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." *Baker v. National City Bank of Cleveland,* 511 F.2d 1016, 1018 (6th Cir.1975).

In *Baker* the court pointed out that although § 4–303 does not prescribe particular steps for effecting a setoff, Comment 5 to that statute states: "[T]he effective time [of the setoff] is when the setoff is actually made." The *sending* of a telegram to the depositor, said the court in *Baker,* "would have clearly established the time at which the setoff was effectuated."

In the case at bar the bank had a right to set off Nina's check, for which there was insufficient funds, against her account 338362. It made the decision to exercise that right, it made the appropriate entry in her account, and notified her by letter and telegram that it had exercised its setoff right. That was sufficient to effectuate the setoff. *In re Saugus General Hosp., Inc.,* 698 F.2d 42, 47[8] (1st Cir.1983).

■ Since the case at bar is a situation between the bank and its customer, the latter being the drawer-payee of the check involved, it is an exercise in semantics, but nevertheless accurate, to say that the bank could properly dishonor Nina's check or that the bank could honor it and properly exercise its right of setoff, when the funds proved insufficient, by charging it back against account 338362.

That portion of the judgment awarding plaintiff Nina Smock Hill $2,200 against defendant Mercantile First National Bank of Doniphan is reversed; in all other respects the judgment is affirmed.

TITUS, MAUS and CROW, JJ., concur.

PREWITT, C.J., concurs in result with opinion.

PREWITT, Chief Judge, concurring in the result.

I agree with the result but not the manner in which it was reached. Neither party advocates my theory and it could be that my distaste for this area of the Uniform Commercial Code has affected my judgment. The author of the majority opinion does an excellent job of reconciling and explaining the sections of the Uniform Commercial Code cited there. However, I do not believe the "Bank Deposits and Collections" of Article 4 or any other part of the Uniform Commercial Code is applicable here. It provides for situations where at least a third party, perhaps another bank, is involved, but not where the transaction is solely between the depositor and the depositor's bank.

The bank agreed to the new account and did so by documents reflecting it. Their internal accounting and posting procedures did not delay the effectiveness of the transaction between plaintiff and the bank as there is no applicable statute which relieved the bank of its responsibility until the posting occurred. The Code perhaps does so in certain instances, but not here. Here, funds were not being collected nor deposited, but plaintiff was attempting to make the bank's debt to her and Michael Smock a debt to her alone. The relationship of a bank and its depositor is based on contract and creates a debtor and creditor relationship. *Smith v. American Bank & Trust Co.,* 639 S.W.2d 169 (Mo.App.1982); 5A Michie, Banks and Banking, § 1, p. 1 (repl. vol. 1983); 5 Zollmann, Banks and Banking, § 3332 (1936). See also 10 Am. Jur.2d, Banks, § 339, p. 301.

As husband and wife, the joint account was presumably held by plaintiff and Michael Smock as tenants by the entirety. *Feltz v. Pavlik,* 257 S.W.2d 214, 218 (Mo. App.1953). There is nothing in the record to rebut that presumption.

Changing an entireties account to an account in one spouse's individual name does not destroy the other spouse's rights unless the latter spouse agrees to the divesting. *Allen v. Kelso,* 266 S.W.2d 696, 703 (Mo.1954). See also *Schwind v. O'Halloran,* 346 Mo. 486, 142 S.W.2d 55, 59 (1940) (proceeds of sale of entireties property absent other factors retains its entirety char-

acteristics upon reinvestment); *Ray v. Ray,* 336 S.W.2d 731, 737 (Mo.App.1960) (presumption that entirety interest follows entirety funds); *Johnson v. Johnson,* 268 S.W.2d 439, 442 (Mo.App.1954) (proceeds from the sale of real estate held by entireties deposited in the name of husband only is entireties property); *Feltz v. Pavlik,* supra, 257 S.W.2d at 218 (joint owner may not assign an account so as to divest the other of the funds, the proceeds retain their character as joint property wherever traced).

There are situations where a joint depositor can terminate another's interest in the debt, in which event a bank may be taking a substantial risk if it would pay the funds owed to the former joint tenant. See *Smith v. American Bank & Trust Co.,* supra, 639 S.W.2d at 173. Here, however, there was no showing of any basis to extinguish Michael Smock's rights and he did not consent to their extinguishment.

The attempt by plaintiff to have the funds paid on her order alone, if effective, did not change Michael Smock's right to withdraw them. He effectively withdrew the funds, whether her check should have been or was honored. There was a debt by the bank to both plaintiff and Michael Smock and under their agreement with the bank, either could demand payment.

By taking the funds Michael Smock could not divest plaintiff of her interest, but that does not create liability for the bank as plaintiff and Michael Smock had agreed with the bank that either could remove the funds. Plaintiff could not by unilateral action change that agreement with the bank. The bank's debt still existed after plaintiff left for California and Michael Smock had the right to demand payment, and he did. What account technically reflected the debt made no difference.